383 F.2d 669
 MILLER EQUIPMENT COMPANY, Appellant,
v.
COLONIAL STEEL AND IRON COMPANY, Troitino and Brown, Inc., Travelers Indemnity Company, Hartford, Connecticut, and U. S. Army Corps of Engineers, Appellees.
 No. 11123.
 United States Court of Appeals Fourth Circuit.
 Argued May 3, 1967.
 Decided July 20, 1967.
 
 Robert P. Buford, Richmond, Va. (Peter O. Ward, Jr., Richmond, Va., and Graham M. Carlton, Salisbury, N. C., and Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., on brief), for appellant.
 Max Busby, Salisbury, N. C. (Nelson Woodson, and Woodson, Hudson & Busby, Salisbury, N. C., on brief), for appellee Colonial Steel and Iron Co.
 E. Glenn Kelly, Asheville, N. C. (Harold K. Bennett, Asheville, N. C., on brief), for appellees Troitino and Brown, Inc., and Travelers Indemnity Co.
 Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.
 ALBERT V. BRYAN, Circuit Judge:
 
 
 1
 Recovery by Miller Equipment Company of the balance of the amount for which it agreed with Colonial Steel & Iron Company to fabricate and deliver structural steel to be incorporated in a Federal bridge project in Virginia was defeated by the District Court's finding that Miller had defaulted in performance of the contract. The finding we believe clearly was not warranted by the facts, which are scarcely disputable. The ensuing judgment must be reversed on this appeal of Miller.
 
 
 2
 With a jury waived, the claim was presented to the Court first under the Miller Act, 40 U.S.C. §§ 270a-270d, and then as a pendent suit. The central issue, however, was embodied in the finding just posited. Hence we go at once to that question. A chronicle of the dealings between the parties will best reveal the point of the breach.
 
 
 3
 1. On September 4, 1962 Troitino and Brown, Inc. entered into a contract with the United States Corps of Engineers to build a concrete and steel bridge across the Cranes Nest River in Dickenson County, Virginia, known as project 614, at a basic price of $762,470.15 and with a completion date of October 13, 1963. In accordance with the Miller Act Troitino gave a payment and performance bond with Travelers Indemnity Company as surety.
 
 
 4
 2. The portion of this prime contract with which the present litigation is concerned was the furnishing of the necessary structural steel, especially 15 girders.
 
 
 5
 3. On September 11, 1962 Colonial agreed with Troitino to supply the latter with the required structural steel at a price of $115,000.00 with delivery at the site of the project on or before July 15, 1963 and with Troitino unloading it there.
 
 
 6
 4. The 15 girders were each approximately 110 feet in length, weighing from 17 to 20 tons apiece.
 
 
 7
 5. On August 23, 1963 Colonial and Miller, the plaintiff-appellant, concluded an agreement by which Miller was obligated to supply the structural steel; to fabricate it according to shop drawings furnished by Colonial; to ship the 15 girders by rail from Miller's plant at Salisbury, North Carolina to Fremont, Virginia, the nearest rail siding to the job; to pay the freight thereon; and to haul the remainder of the steel to the job. The overall price was $106,000.00, but no delivery dates were fixed.
 
 
 8
 6. On November 19, 1963 the 15 steel girders were readied by Miller for shipment and some were loaded on the railroad cars at Salisbury, but on November 25, 1963, Colonial directed Miller to unload them. The direction was given, the District Judge found, "because Colonial was unable to find anyone to unload them at the rail siding for a reasonable price". The uncontradicted testimony discloses that Colonial had obtained a price of $9,000.00 from Metler Crane and Erection Service, Inc. and $8,000.00 from another party, but rejected them as too high.
 
 
 9
 7. Thereupon Colonial agreed to pay Miller, above the original contract price of August 23, 1963, the sum of $3,250.00 to deliver the 15 girders from Miller's plant to the bridge site by means of a special steerable unit to be built by Miller.
 
 
 10
 8. On December 5, 1963 with this special unit Miller hauled the first girder to the construction point.
 
 
 11
 9. On December 16, 1963 the second girder was likewise placed in transit, but when about 10 miles from the job, the unit with the girder was left beside the road because snow had made the road impassable. On January 10, 1964 this second girder was removed from the unit, put roadside and the unit returned to Miller's plant in Salisbury, about 200 miles away.
 
 
 12
 10. Then on January 9, 1964 Miller and Colonial agreed: that Miller would ship 12 of the remaining 13 girders by rail to Fremont, some 20 miles from the job site; that the means of their carriage from Fremont to the job site would be the steerable unit; that Colonial would unload the girders at Fremont and place them on Miller's unit; that the price would be $3,250.00; and that the new agreement superseded the similar one of November 1963.
 
 
 13
 11. On January 9 and 14, 1964 Miller shipped the 12 girders to Fremont, and between January 14 and 30, 1964 Colonial unloaded them along the rail siding.
 
 
 14
 12. Miller did not have the steerable unit at Fremont to receive the 12 girders, and in this the District Court found that Miller had inexcusably breached its contract of January 9, 1964 with Colonial.
 
 
 15
 13. On January 30, 1964 Colonial advised Troitino that it was unable to deliver the 12 girders until the roads were made passable for Colonial's equipment to reach the job site; on February 13, 1964 Troitino notified Colonial that it would procure delivery of the girders through other means unless Colonial delivered them before February 17, 1964; on the latter date Troitino contracted with Metler to carry the girders from the Fremont siding to the job for the price of $12,000.00; and beginning on February 26th, Metler completed the undertaking 12 days later. The Court found this conduct of Colonial to be a breach of its contract with Troitino.
 
 
 16
 14. On February 27, 1964 Miller transported the last or 15th girder on the steerable unit from its Salisbury plant to a spot within 7 miles of the job, where it was handed over to Metler who took it the rest of the way.
 
 
 17
 In our view, a total breach of the contract between Colonial and Miller occurred when Colonial, on or about November 25, 1963, directed Miller to remove the girders from the railroad cars. Para. 6 supra. No acceptable excuse or mitigating explanation is offered. Indeed, Colonial admitted in oral argument here that had Colonial then fulfilled its contractual obligation to receive the girders at the rail head there would now be no dispute. The agreements subsequent to Colonial's breach were separate and distinct from the original contract; they were made merely to ease Colonial's difficulty.
 
 
 18
 The District Court erred, too, we think, in its finding that Miller abrogated the agreement of January 9, 1964. Para. 12 supra. The contract stipulated that the girders, when discharged at the railroad siding in Fremont, were to be placed by Colonial, and hauled by Miller, upon the steerable unit. The agreement was necessitated by the snow blockage of those roads which the Virginia Department of Highways specified for the transportation. Although punctually shipped, the girders arrived while the roads were still impassable by Miller's unit. All the while Miller kept in touch with the Department. It hauled the 15th girder with this rig from Salisbury to the job site the next day, February 27, 1964, after a favorable report was given by the Department. For this purpose the unit had to travel almost 200 miles. All of this delay, it was conceded in argument, was impliedly contemplated in the agreement's stipulation that the movement should be made by the steerable unit.
 
 
 19
 During the delay Colonial deposited the girders at two inaccessible locations along the siding. Para. 11 supra. It had provided no means to lift the girders onto Miller's unit even had this vehicle been available. Apparently, Colonial discharged the girders from the cars, without waiting for Miller's equipment, merely to save payment of demurrage to the railroad. By the time Miller could comply with the agreement of January 9, 1964, Colonial had withdrawn from its undertaking with Troitino, and the latter had itself taken over the movement of the girders to the job. No fault of Miller's contributed to Colonial's abandonment of the undertaking.
 
 
 20
 Miller sued for $18,914.46, made up as follows:
 
 
 21
 Amount stipulated in contract of
 August 23, 1963 ........................... $106,000.00

 Amount of January 9, 1964 contract .......... 3,250.00
 ___________
 $109,250.00
 Less amounts paid Miller .................... 90,335.54
 ___________
 Balance ................. $ 18,914.46
 
 
 22
 Against this balance the District Judge charged Miller with the following sums as damages suffered or incurred by Colonial allegedly as a result of Miller's omission to receive the 12 girders on arrival at Fremont:
 
 
 23
 Cost of delivering girders by Metler ............................... $ 12,000.00

 Proportion of the total liquidated damages charged
 by U. S. Engineers to Troitino for delay in completion
 of the contract, back-charged by Troitino
 to Colonial and allowed Colonial against Miller ................... 3,700.00

 Amount of January 9, 1964 contract .................................. 3,250.00[1]
 ___________
 $ 18,950.00
 
 
 24
 As the deductions exceeded the claim, no recovery at all was permitted Miller.
 
 
 25
 To repeat, we think Miller breached none of its agreements, but that Colonial was the violator. As we think, too, that the amounts for which Miller sues represent reasonable damages for Colonial's defaults, Miller should recover the claimed sum of $18,914.46. The next question is under what theory of law — Miller Act or common law breach of contract — the recovery should be effectuated. The point is significant because there would be no liability upon the Travelers as surety on the prime contract bond if it is not a Miller Act case. Moreover, a substantial claim under the Miller Act, for reasons noted below, is necessary if the contract claim is presently to be entertained.
 
 
 26
 Under the Act[2], 40 U.S.C. §§ 270a-270d, the bond protects only subcontractors and their sub-subcontractors, laborers and materialmen. In MacEvoy v. United States, for Use and Benefit of Calvin Tompkins Co., 322 U.S. 102, 107, 108, 64 S.Ct. 890, 88 L.Ed. 1163 (1944) the Court so declared and defined "subcontractor" as follows:
 
 
 27
 "The proviso of § 2(a) [40 USC 270b (a)], which had no counterpart in the Heard Act, makes clear that the right to bring suit on a payment bond is limited to (1) those materialmen, laborers and subcontractors who deal directly with the prime contractor and (2) those materialmen, laborers and sub-subcontractors who, lacking express or implied contractual relationship with the prime contractor, have direct contractual relationship with a subcontractor and who give the statutory notice of their claims to the prime contractor. To allow those in more remote relationships to recover on the bond would be contrary to the clear language of the proviso and to the expressed will of the framers of the Act".
 
 
 28
 * * * * * *
 
 
 29
 "But under the more technical meaning, as established by usage in the building trades, a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen. * *"
 
 
 30
 The District Court concluded that Colonial was not a subcontractor of Troitino, but simply a supplier of materials, thus excluding Miller from the coverage of the bond. The following subordinate findings account for the opinion of the District Court that Colonial was no more than a materialman:
 
 
 31
 "5. * * * The prime contract in paragraph GC-6, Subcontractor, required that each subcontract contain Clause 21, a clause providing for Non-discrimination in Employment, and further required all subcontracts to contain all clauses in Standard Form 19-A [setting minimum labor standards]. Each subcontract [of the 4 let to others than Colonial] * * * contained a requirement that the subcontractor reimburse Troitino a proportionate part of the premium for the payment and performance bond executed by Travelers Indemnity.
 
 
 32
 "6. The sales contract between Colonial and Troitino * * * was neither submitted to nor approved by the Engineers. The contract was neither executed on forms approved by the Engineers nor did it contain Clause 21 or the clauses in Standard Form 19-A as required by the prime contract. The sale contract did not contain any provision for reimbursement by Colonial to Troitino of a proportionate part of the premium for the payment and performance bond executed by Travelers Indemnity Company, and Colonial was never required to contribute any amount toward the premium.
 
 
 33
 "7. * * * Little, if any, discretion was vested in Colonial as to the fabrication of the structural steel as the design and computations required were derived from the drawings of the Engineers and the ASC Manual. Thus, the Court concludes that Colonial was merely a materialman in connection with the work on project 614."
 
 
 34
 Our opinion, however, is that despite the form of the written contract between Troitino and Colonial, Colonial in actuality was a subcontractor as envisaged by the Act and MacEvoy. Certainly Colonial was no ordinary materialman. The amount due it for successful performance of its contract with Troitino was $115,000.00, more than 15% of the sum due Troitino under the prime contract and 64% of item 20, a fundamental provision of that contract because it was the specification for structural steel. The Troitino-Colonial agreement called not for the mere supply of materials but for the custom fabrication of massive girders and their accessories, key and integral components of the bridge, designed and fabricated to mesh precisely in their final assembly on the job-site. See Travelers Indem. Co. v. United States, 362 F.2d 896 (9 Cir. 1966); United States v. MSI Corp., 350 F.2d 285 (2 Cir. 1965); compare United States for Use of Bryant v. Lembke Constr. Co., 370 F.2d 293 (10 Cir. 1966). It is of little moment here that Troitino designated the Colonial agreement as a "purchase order" for the steel. Nor is it surprising that Colonial neither contributed to the bond premium nor subscribed to Clause 21 and Standard Form 19-A. Troitino never asked it to do so. We cannot posit Colonial's status as materialman or subcontractor merely upon Troitino's neglect to enforce its contract with the government, or to require that all subcontractors contribute to the premium.
 
 
 35
 Although we allow recovery under the Miller Act, we think it meet that the primary liability be Colonial's for breach of contract. Indeed, judgment against Colonial would have been appropriate even had the statutory action failed. Despite the lack of diversity between Miller and Colonial, Miller's claim under the Act would have been a substantial one, not frivolously brought, and since resolution of its contract claim turned on the same proof, the doctrine of pendent jurisdiction would have permitted the case to proceed. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Rumbaugh v. Winifrede R.R., 331 F.2d 530, 539-540 (4 Cir. 1964). In this we join the District Court. The law of North Carolina then became applicable, requiring performance by Miller of its contract — made in that State — in order to succeed at all. Vetco Concrete Co. v. Troy Lumber Co., 256 N.C. 709, 124 S.E.2d 905 (1962); Ranlo Supply Co. v. Clark, 247 N.C. 762, 102 S.E.2d 257 (1958). Miller did comply with its agreement and would be entitled to judgment against Colonial whether or not we ruled for it under the Act.
 
 
 36
 The action will be remanded for entry by the District Court of a judgment in favor of Miller Equipment Company for the sum of $18,914.46 with interest thereon at the rate of 6% per annum from February 27, 1964 until paid, together with costs. The judgment will lie primarily against Colonial, whose fault it was that occasioned Miller's loss, and secondarily upon Troitino and Travelers for any deficiency.
 
 
 37
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 While now academic, it is conceded by all parties that the charge of $3,250.00 was a duplication, because this item was included in the deduction of $12,000.00
 
 
 [2]
 "§ 270a. Bonds of contractors for public building or works; waiver of bonds covering contract performed in foreign country
 "(a) Before any contract, exceeding $2,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as `contractor'. * * *"
 "§ 270b. Same; rights of persons furnishing labor or material
 "(a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under section 270a of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him: Provided, however, That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond * * *."