**VULCAN MATERIALS COMPANY,**
Plaintiff,

v.

Fred K. BETTS, III, Quarry, Inc., Oman Construction Company, Inc., and Reliance Insurance Company, Defendants.

No. 67–C–42–H.

United States District Court,
W. D. Virginia,
Abingdon Division.

Aug. 19, 1970.

B. Purnell Eggleston, Eggleston, Holton, Butler & Glenn, Roanoke, Va., for plaintiff.

George S. Aldhizer, II, Wharton, Aldhizer & Weaver, Harrisonburg, Va., for defendants.

## OPINION

WIDENER, District Judge.

Vulcan Materials Company commenced this action to recover $44,989.39 from the prime contractor, his bondsman, and a supplier of crushed rock, under a public construction contract. Jurisdiction is based on diversity of citizenship.

The case is submitted for decision on a stipulation of facts, exhibits, and a single deposition. Defendant, Oman Construction Company (hereinafter referred to as Oman), entered into a contract dated December 3, 1965, with the Commonwealth of Virginia for the con-

struction of a 5.183 mile portion of Route 256 in Augusta County. By the terms of the contract, Oman agreed to "do all the work and furnish all the materials" necessary to carry out the agreement.

On the same date, Oman, as principal, and Reliance Insurance Company (hereinafter referred to as Reliance), as surety, executed the contract bond required by statute in the amount of $796,860.00 in favor of the Commonwealth of Virginia. That bond guaranteed that Oman would "promptly pay * * * for labor and material incurred by said principal."

By purchase order dated July 18, 1966, Oman contracted to purchase from defendant, Fred K. Betts, III, Quarry, Inc., (hereinafter referred to as Betts) 47,030 tons of stone and material to be used by Oman on the aforesaid project. The purchase order called principally for "C.B.R. 30 Select Material, Type 1, to be delivered in proper condition to meet C.B.R. 30 compaction" and specifications of the Department of Highways. The material was to be delivered to Oman's spreader boxes on the grade at the rate of at least 4,000 tons per 9-hour day, on 72 hour notice. A smaller item of 1,100 tons of crusher run ¾″ rock mentioned in the purchase order to Betts is not mentioned in the contract between Oman and the Highway Department, is not referred to in any of the stipulations, and will not be further considered.

By letter of August 18, 1966, Betts, in turn, ordered from plaintiff, Vulcan, substantially all of the C.B.R. 30 Select Material, Type 1, stone it had contracted to prepare and supply to Oman. Vulcan acknowledged the order August 22, 1966. Consequently, Vulcan actually prepared to specifications the stone that was used in building the highway. Betts then hauled or caused the hauling of the stone to the spreader boxes at the grade site. Vulcan billed Betts and Betts billed Oman. Oman paid Betts for all materials delivered to the construction site until on or about April 17, 1967, at which time Oman was advised that Betts'

payments for the materials purchased from Vulcan were in arrears. Thereafter, Oman made two payments by checks aggregating $1,760.61 made payable to Betts, endorsed by Betts, and delivered to plaintiff by Oman, leaving a balance of $44,989.39 due plaintiff.

A default judgment has been entered against Betts, which failed to appear. Vulcan now seeks recovery against the prime contractor and its surety on the bond, the theory being that it has a direct statutory right of action against Oman and Reliance for failure to comply with 1950 Code of Virginia § 11–20 requiring bond of a subcontractor.

The pertinent portion of § 11–20 which applies to public highway construction contracts reads as follows:

"No contractor * * * shall subcontract any work required by the contract except under the following conditions: each subcontractor shall furnish and the contractor shall require * * * a payment bond with surety thereon * * * which shall be conditioned upon the payment to all persons who have, and fulfill, contracts which are directly with the subcontractor for performing labor and furnishing materials in the prosecution of the work provided for in the subcontract. Every such bond shall be construed, regardless of its language, as incorporating, within its provisions, the obligation to pay those persons who furnish labor or materials as aforesaid, provided, however, that subcontracts between the contractor and a manufacturer or fabricator shall be exempt from the provisions requiring a payment bond. * * *"

■ Oman did not require and Betts did not post bond according to the foregoing code section. It is settled in Virginia that the prime contractor and surety on the bond are liable for claims against a subcontractor for labor, material and supplies furnished, all of which were used in the construction of the road. Fidelity and Casualty Company v. Copenhaver, 159 Va. 126, 165 S.E. 528

(1932); see Luck & Sons v. Boatwright, 157 Va. 490, 162 S.E. 53 (1932) (applying Maryland law). The bond in *Copenhaver* was identical to the one executed by Oman. The contractors were held liable in both *Boatwright* and *Copenhaver*, even though they did not directly incur the debt. The court, in *Boatwright* stated that the settled policy of the law is "to protect those who furnish labor, supplies and material used in and about the construction of public work, and, of this, contractors must take cognizance. Against the shortcomings of subcontractors, they and their sureties can be amply protected by proper bond." 157 Va. 490, 505, 162 S.E. 53, 58.

Although suppliers of subcontractors may recover on the bond of the prime contractor in Virginia, the statute makes no attempt to define the term "subcontractor", nor has any Virginia case been found which turns on the meaning of the term "subcontractor."

Defendants urge that plaintiff may not recover because Betts was only a materialman, not a subcontractor, since it only supplied gravel for the job. They support their contention by the opinion of the state highway commissioner that Betts was only a supplier. They also point to the conjunctive language of highway department regulations which mention "labor *and* materials" [italics added], and contend that to be a subcontractor a person must furnish both, but urge that Betts furnished only materials. A careful examination of the Oman-Betts contract discloses that Betts was a subcontractor.

First, the purchase order to Betts was in fact a contract for "Select Material, Type 1, Min. C.B.R. 30, 47,030 Tons", which was all of a specific part (item 4) of the contract requirement according to the proposal dated November 10, 1965. MacEvoy Co. v. United States, 322 U.S. 102, 108, 109, 64 S.Ct. 890, 88 L.Ed. 1163 (1944). It was for the entire rock requirement under the contract. And that requirement was an integral part of the contract to build the road. See Miller Equipment Company v. Colonial Steel and Iron Company, 383 F.2d 669, 674 (4th Cir. 1967), cert. denied 390 U.S. 955, 88 S.Ct. 1049, 19 L.Ed.2d 1148 (1968). Second, in addition to being 100% of the rock requirement, the contract for the C.B.R. Material amounted to more than 9% of the total contract price on the entire project. Third, the work performed by Betts in preparing material to meet specific compaction requirements saved Oman labor it would otherwise have had to perform with its own machinery in meeting the compaction requirements of the State Highway Department. The uncontradicted evidence in the case discloses that compaction is ordinarily the responsibility of the prime contractor. Fourth, Betts either hauled the material or arranged to have it hauled to the grade site. Fifth, the agreement between Oman and Betts was of a continuing nature for a specific part of the job. A definite quality of materials was contracted for. This was no casual purchase of incidental goods off the shelf. It was a definite agreement for Betts to perform all of a specific part of the contract which Oman had entered into with the State.

In the case of Staples v. Adams, Payne & Gleaves, Inc., 215 F. 322 (4th Cir. 1914) is found the only discussion under Virginia law of the meaning of "subcontractor" to come to the attention of the court. The court held that one who furnishes materials may be a subcontractor under the mechanics lien statute if he furnishes all of them under a continuing contract and not separately under orders as needed. In *Staples*, the court took particular note that the general contractor was free to purchase elsewhere, and found a furnisher of materials to be a materialman. Here, Oman had no freedom to purchase elsewhere; it was obligated to accept delivery from Betts. See Vol. 21A, M.J., p. 471.

While there seems to be no judicial definition of the word "subcontractor" in Virginia, it has been defined by statute as far back as 1894, Acts 1893–94, p. 523, as including contractors, laborers,

mechanics, and those furnishing materials to a job. This definition has been adopted with little rewording in the mechanics lien statutes in Virginia recodifications of 1919, § 6426, and 1950, § 43–1.

The word "general contractor" has been judicially defined: " * * * if his contract is made with the owner he is a general contractor within the meaning of the act." Merchants and Mechanics Savings Bank v. Dashiell, 25 Grat. 616, 622 (1874). The necessary inference is that a subcontractor is one who contracts with the general contractor if other than the owner. These definitions were codified in their present form in Virginia Code of 1919, § 6426, and were merely a restatement of the common law definitions under the mechanics lien statutes.

The *Staples* case, in 1914, with its definition of subcontractor is consistent with the Virginia common law and statutory definitions. Although the definitions, both statutory and common law, of the word "subcontractor" under the mechanics lien statutes of Virginia are not binding on the court, they are most persuasive.

The act in question, Virginia Code § 11–20, was enacted in 1932, and was amended, in 1952, 1958, and 1962 into the form here before the court. The meaning of the word "subcontractor" as used in the section has not been judicially defined in thirty-eight years. The purpose of the act is undoubtedly as stated in Somerville Company v. Broyhill, 200 Va. 358, 362, 105 S.E.2d 824 (1958), very persuasive authority since it was decided upon the similar Virginia statute § 11–23:

> "Materialmen and subcontractors who furnish supplies or work for the principal who has contracted with the public agency mentioned in that section for the construction of the public buildings and improvements are unable to perfect mechanic's liens against the property for their protection. They cannot avail themselves of the provisions of §§ 43–7 and 43–9,

Code 1950, for liens cannot be perfected against the public buildings and other improvements. Section 11–23 is remedial in character, its language broad and inclusive, and obviously it was enacted to afford protection to materialmen and subcontractors. It must be liberally construed in their favor."

As is apparent, the court has cited Virginia cases and statutes referring to the building trades, for that is the exact teaching of the U. S. Supreme Court in *MacEvoy*.

In *MacEvoy*, a case under the Miller Act, 40 U.S.C. § 270a et seq., the court specifically dealt with the meaning of the word "subcontractor." Like Virginia Code § 11–20, the Miller Act was to protect " * * * those whose labor and materials go into public projects." 322 U.S. 102, 107, 64 S.Ct. 890, 893. The Virginia and federal statutes are quite similar and were enacted for the same purpose.

The court defined the word "subcontractor" in the following language:

> "The Miller Act itself makes no attempt to define the word 'subcontractor.' We are thus forced to utilize ordinary judicial tools of definition. Whether the word includes laborers and materialmen is not subject to easy solution, for the word has no single exact meaning. In a broad, generic sense, a subcontractor includes anyone who has a contract to furnish labor or material to the prime contractor. But under the more technical meaning, as established by usage in the building trades, a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen."

The fact that the court excluded ordinary materialmen who furnish materials to another materialman is of no consequence here. The definition of the word is what is important, particularly the law which teaches us to refer to the

building trades usage, and the reference to a "specific part" of a material requirement, which is in accord with the previous definition of "subcontractor" set out in *Staples* in this circuit under Virginia law. Obviously the materialman in *MacEvoy* had not agreed to furnish a specific part of the materials.

The Fourth Circuit, in *Miller Equipment Company* followed *MacEvoy* and defined the word "subcontractor" in a Miller Act case as follows:

"But under the more technical meaning, as established by usage in the building trades, a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen." 383 F.2d 669, 673.

It there held that, in a bridge construction on a highway project, a company supplying all of the structural steel, cut to size, and delivered to a railway station near the construction site, was a subcontractor within the meaning of the Miller Act, and not a mere materialman. Again, the definition was consistent with *Staples*.

■ With reference, then, to the common and statutory law of Virginia, and the applicable federal decisions of the Supreme Court and this circuit, defining the word "subcontractor," I am of opinion, and so find as a matter of fact and also as a matter of law, that Betts was a subcontractor within the meaning of Virginia Code § 11–20 as it applies to this action.

Section 11–20 also provides that: "In the event a contractor fails to require from a subcontractor the bond provided for herein, any person who has and fulfills contracts directly with such subcontractor for performing labor and furnishing materials in the prosecution of the work provided for in the subcontract shall have a right of action against the obligor and sureties on the bond * * * of the contractor."

Vulcan having supplied materials to a subcontractor, under its purchase order, is entitled to a right of action against Oman and its surety, Reliance.

Having decided that Betts is a subcontractor, it is clear that Vulcan also is entitled to its right of action against Oman and Reliance on the bond under the rule of *Copenhaver.*

■ The fact that Oman has paid Betts the sums due under the contract does not relieve it from payment under the bond. Noland Company v. West End Realty Corporation, 206 Va. 938, 147 S. E.2d 105 (1966). The obligation incurred under the bond may be distinguished from an obligation arising from contractual relations and satisfaction of the latter does not satisfy the former.

■ Defendants further defend on the basis that the applicable Highway Department regulations § 108.01 use the phrase "performing labor and furnishing materials." They say the use of the word "and" means that in order to be a subcontractor a person must furnish both labor and materials to a job. With this, the court does not agree. The phrase is obviously copied from its two uses in Virginia Code § 11–20. That section, in part, further provides specifically:

"Every such bond shall be construed, regardless of its language, as incorporating, within its provisions, the obligation to pay those persons who furnish labor *or* materials. * * *" [Italics added.]

Even if the regulation is meant by the Highway Department in the sense that defendants contend, it must fall before the plain language of the statute. The word "and" is obviously used as a "reference to either or both of two alternatives." Webster's New International Dictionary, 2nd Ed., p. 98.

Exactly the same language was construed as providing a right of action to a supplier of materials only in *Broyhill.*

The fact that the Highway Commission is of opinion that Betts was not a subcontractor is an administrative opin-

ion and should ordinarily be persuasive. In this case, however, it is obvious that both Oman and the Department were violating the Department's own regulations which provide in part:

"§ 108.01. * * * No portion of the contract shall be sublet, assigned or otherwise disposed of without the written consent of the Department. * * *"

When Oman entered into a binding purchase order contract with Betts for all of a specific item of the construction contract, the C.B.R. 30 crushed rock, under the circumstances recited above, it was obviously a disposition of a part of Oman's obligation requiring approval of the Department. The plain language of the regulation permits no other inference. The fact that Oman did not request written permission from the Department, and the Department did not question Oman about the matter when brought to its attention, make the opinions of the Department, so far as this case is concerned, of little, if any, weight. If Betts had defaulted instead of getting Vulcan to perform the greater part of its job, and the job had been held up as a result of having no C.B.R. 30 stone, there is little doubt that Betts would have faced a certain lawsuit from Vulcan. There is also little doubt that

---

1. No simon pure definition of the words "general contractor" as distinguished from "subcontractor" is found under Virginia common law. The common law definitions of the words have come under the mechanics lien statutes, which necessarily refer to the "building trades" as taught by *MacEvoy* and *Miller Equipment Company.* The words as distinguished seem to have come into the law with the advent of mechanics' liens.

The court has considered Virginia Code of 1860 c. CXIX; Virginia Acts of Assembly 1869–70, c. 294; Virginia Code of 1873, c. CXV; Virginia Acts of Assembly 1893–94, p. 523; Virginia Code of 1887, c. CX; Virginia Code of 1919, c. 270; Virginia Code of 1950, Title 43; and the various annotations and many cases too numerous to cite individually decided thereunder, in arriving at its decision.

For a good start on the myriad of conflicting decisions as to the differentiation, if any, between subcontractor and materialman in the various jurisdictions, see Annotation, 141 A.L.R. 321.

The following two sections from the Virginia State Highway Department Road and Bridge Specifications of April 1, 1958, have also been considered by the court:

*Section 101—Definition of Terms*
"WORK—Work shall be understood to mean the furnishing of all labor, materials, equipment and other incidentals necessary or convenient to the successful completion of the project and the carrying out of all duties and obligations imposed by the contract."

*Section 108.01*
"SUBLETTING OR ASSIGNMENT OF CONTRACT. The contractor shall perform with his own organization work amounting to not less than 50% of the contract. No portion of the contract shall be sublet, assigned or otherwise disposed of except with the written consent of the Department. Request for permission to sublet, assign or otherwise dispose of any portion of the contract shall be in writing and accompanied by a showing that the organization which will perform the work is particularly experienced and equipped for such work. The contractor shall give assurance that the minimum wage for labor as stated in his proposal shall apply to labor performed on all work sublet, assigned or otherwise disposed of in any way. Consent to sublet, assign or otherwise dispose of any portion of the contract shall not be construed to relieve the contractor of any responsibility for the fulfillment of the entire contract.

The Contractor shall require, as a part of the agreement between himself and the subcontractor, a payment bond in the amount of 100 per cent of the work sublet to the subcontractor, which shall be conditioned upon the payment to all persons who have, and fulfill, contracts that are directly with the subcontractor for performing labor and furnishing materials in the prosecution of the work provided for in the subcontract. Every such bond shall be construed, regardless of its language, as incorporating, within its provisions, the obligation to pay those persons who furnish labor and materials as aforesaid. No subcontractor shall be approved by the Department until and unless a satisfactory payment bond is furnished by the subcontractor, and a copy filed with the Department."

the Department would then have taken the position that Betts was not "* * * particularly experienced and equipped for such work," as set out in Specification § 108.01, and held Oman and its surety to account.

It should be stated parenthetically [1] that the fact that Betts was legally obligated to Oman to perform its contract carries considerable weight with this court in its decision that Betts was a subcontractor and no mere materialman. Of like weight, the court considered the decision in *Miller Equipment Company*. Other than the substitution of steel for rock, and the federal rather than the state setting, *Miller Equipment Company* and the instant case are very nearly indistinguishable.

An order is this date entered allowing the plaintiff to recover consistent with this opinion.