**The UNITED STATES of America for the Use and Benefit of PARKER–HANNIFIN CORPORATION, Plaintiff,**

v.

**The LANE CONSTRUCTION CORPORATION et al., Defendants.**

Civ. No. 78–795.

United States District Court,
M. D. Pennsylvania.

Aug. 2, 1979.

As Amended Nov. 14, 1979.

Andrew Hailstone, Henkelman, McMenamin, Kreder & O'Connell, Scranton, Pa., Alan R. Lepene, Thompson, Hine & Flory, Cleveland, Ohio, for plaintiff.

Harrison C. Warren, Meriden, Conn., Jack M. Hartman, Shearer, Mette & Woodside, Harrisburg, Pa., for defendants.

## OPINION

MUIR, District Judge.

### I. Introduction.

The above action was filed in the name of the United States of America for the use and benefit of the Parker-Hannifin Corporation (Parker) under the Miller Act, 40 U.S.C. § 270a et seq., seeking recovery on a payment bond posted by the Defendants in accordance with the provisions of the Miller Act. Parker asserts that it has not been paid for the manufacture of hydraulic cylinders which were utilized by Vertex Systems, Inc., a purported sub-contractor of Lane Construction Corporation (Lane), the prime contractor for the Cowanesque Lake Dam Project, as a means for opening and closing gates which were inserted by Lane into the intake tower of the dam. The matter was tried to the Court on June 28, June 29, July 5, July 9, and July 10, 1979. The following represent this Court's findings of fact, discussion, and conclusions of law.

### II. Findings of Fact.

1. The plaintiff in interest in this case is Parker-Hannifin Corporation (Parker). (Undisputed)

2. Parker is an Ohio corporation with its principal place of business in Cleveland, Ohio. (U)

3. Lane is a Connecticut corporation with its principal place of business in Meriden, Connecticut. (U)

4. The Home Insurance Company is a New Hampshire Corporation with its principal place of business in Manchester, New Hampshire. (U)

5. Seaboard Surety Company is a New York corporation with its principal place of business in New York, New York. (U)

6. American Reinsurance Company is a New York corporation with its principal place of business in New York, New York. (U)

7. INA Reinsurance Company is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. (U)

8. General Reinsurance Corporation is a Delaware corporation with its principal place of business in Wilmington, Delaware. (U)

9. Employers Reinsurance Corporation is a Missouri corporation with its principal place of business in Kansas City, Missouri. (U)

10. Prior to August 11, 1976, Lane intended to submit a bid to the United States Government as a prime contractor on the Cowanesque Lake Dam project located in Tioga County, Pennsylvania. (U)

11. In its preparation for submission of said bid, Lane requested proposals and quotations from various parties for utilization in formulation of its bid. (U)

12. On or about July 27, 1976, Vertex Systems, Inc. (Vertex), in response to Lane's request, delivered to Lane a quotation on Sections 15A and 15B of the specifications as well as on Section 5C of the specifications, which quotation contained the following language;

"Item 15A–1 and 15B–1 are complete in accordance with the plans and specification, excluding field painting. Item 5C–1 excludes field painting, spiral stair and wire mesh partition enclosing elevators. The above prices are F.O.B. nearest rail siding, presumably Wellsboro Junction, Pennsylvania.

Any present or future sales, use, excise, or other similar tax applicable to the sale are not included.

The above prices quoted are conditioned upon 90% monthly payments with 10% retention, 5% of the purchase price is payable on delivery, and the remaining 5% payable upon acceptance, but not later than one hundred twenty (120) days after shipment.

Within thirty (30) days of receipt of the purchase order, Vertex will submit for your approval a cost breakdown for the purpose of making progress payments showing the amount allocated for engineering, material and labor. These amounts will total to the sales price." (U)

13. The quotation did not contemplate installation in the field by Vertex. (U)

14. Vertex requested that The Orton Company (Orton) furnish a quotation for hydraulic cylinders to be used in the items covered by the Vertex quotation. (U)

15. Orton, in turn, requested a quotation from Parker for hydraulic cylinders. (U)

16. Parker supplied to Orton a quotation, as requested by Orton for the hydraulic cylinders.

17. Orton is a seller of equipment manufactured by Parker and several other manufacturers and also acts as a sales agent for Parker for equipment manufactured by Parker. (U)

18. Orton is not a subsidiary of Parker nor is it controlled by Parker.

19. When Orton sells equipment manufactured by Parker as a distributor, Orton buys the equipment from Parker and resells the equipment to Orton's customer.

20. In connection with such resales of equipment, Orton assumes the credit risk in the event the customer fails to pay for the equipment.

21. When Orton acts as a sales agent for Parker, Orton instructs the customer to issue its purchase order to Parker in care of Orton and Orton then forwards the order directly to Parker. (P–51)

22. When an order is forwarded to Parker by Orton acting as a sales agent, the equipment covered by the order is shipped directly to the customer by Parker and invoiced directly to the customer by Parker.

23. When Orton acts as a sales agent for Parker, Orton receives a commission from Parker based upon a percentage of the price of the equipment paid by the customer to Parker.

24. When Orton acts as a sales agent for Parker, Parker assumes the credit risk with respect to the order.

25. On or about July 27, 1976, Orton supplied the quotation requested by Vertex based on hydraulic cylinders manufactured by Parker. (U)

26. Vertex used the Orton quotations in Vertex's quotation to Lane.

27. The quotation directed Vertex to issue its purchase order to Parker-Hannifin Corp. c/o The Orton Co. (U)

28. On or about August 9, 1976, Vertex sent a letter to Lane reaffirming its previous quotation of July 27, 1976. (U)

29. Lane accepted Vertex's proposal on or about August 16, 1976. (U)

30. The quotation price proposed by Vertex and accepted by Lane was Seven Hundred Twenty Six Thousand Five Hundred ($726,500) Dollars, itemized as follows:

(a) Specification 15A—Hydraulic gates and accessories . . . . . . . . . . . . . . $438,800

(b) Specification 15B—Emergency gate and gate-handling crane . . . . . . . 198,000

(c) Specification 5C—Miscellaneous metals . . . . . . . . . . . . . . . . . . . . . . 89,700

$726,500

(U)

31. The completed dam will be a rolled earth and rockfill construction of the following dimensions:

| | |
|---|---|
| height | 171 feet |
| length | 3,100 feet |
| width (at base) | 1,615 feet |
| width (at top) | 25 feet |

32. The entire dam construction area occupies more than 1,000 acres.

33. The employees who have worked on the dam have expended at least 1,250,000 total man hours of labor on the dam.

34. On the basis of Lane's bid, on or about August 11, 1976, the United States of America, acting by the Department of the Army, and Lane entered into Contract No. DACW31–76–C–0094 (the "Prime Contract"), pursuant to which Lane undertook to furnish all labor and materials and to perform all work in connection with the Cowanesque Lake Dam Project at Tioga, Pennsylvania. (U)

35. The total estimated contract price for said contract was Thirty-Seven Million, One Hundred Fifty-Three Thousand, Twenty-Five Dollars and Fifty Cents ($37,153,-025.50). (U)

36. Pursuant to the Miller Act and the terms of the Prime Contract, defendant Lane and the defendant sureties, on or about August 13, 1976, duly executed a Miller Act Bond to the United States of America, wherein Lane, as principal, and the sureties bound themselves jointly and severally in the sum of $2,500,000 conditioned that if the principal should promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in the Prime Contract, and any and all duly authorized modifications, notice of which modifications to the sureties being waived, then the above obligation would be void and of no effect. (U)

37. The Miller Act Bond was duly accepted by the United States of America and, upon such acceptance, the Prime Contract for the construction and completion of the Cowanesque Lake Dam Project was awarded to Lane. (U)

38. Item No. 15A–1 of the Prime Contract required Lane to manufacture, furnish and install in the Cowanesque Lake Dam two hydraulic service gate assemblies and two hydraulic low flow gate assemblies complete with hydraulic power units, hydraulic cylinders, controls, piping, gate stems, gates, air vents and appurtenances. (U)

39. Item No. 15B–1 of the Prime Contract required Lane to manufacture, furnish and install one emergency gate and two emergency gate frames complete with all accessories and appurtenances including a gate handling crane. (U)

40. Item No. 5C–1 of the Prime Contract required Lane to manufacture, furnish and install miscellaneous metals. (U)

41. Lane was obligated to perform the Prime Contract in strict accordance with the Specifications and Drawings referred to in the Contract. (U)

42. Section 15A of the Specifications referred to in the Prime Contract dealt with the manufacture, furnishing and installa-

tion of the hydraulic service gates and low flow gate assemblies. (U)

43. Section 15B of the Specifications referred to in the Prime Contract dealt with the manufacture, furnishing and installation of the emergency gate and gate handling crane. (U)

44. The dimensions of the above-mentioned gates are as follows:

> 2 service gates—6 feet by 14 feet each
> 1 emergency gate—6 feet by 14 feet
> 2 low flow gates—3 feet by 4 feet each.

45. Virtually all of the work which Lane was obligated to perform under Specifications 15A and 15B was contracted to Vertex except for those matters related to installation at the project site.

46. There was no contract between Lane and Vertex requiring Vertex to install in the field any of the items furnished to Lane as specified above.

47. Pursuant to the quotation of Vertex accepted by Lane, Vertex submitted to Lane a cost breakdown of its quotation indicating the amounts allocated by Vertex to engineering, materials and labor as follows:

> Engineering    $ 43,580.00
> Materials      $426,250.00
> Labor          $256,670.00 (U)

48. Pursuant to the Vertex quotation accepted by Lane, Lane agreed to make monthly progress payments to Vertex subject to a ten percent retention pending completion of the contract. (U)

49. The said monthly progress payment provision was accepted by Lane due to the extended period of time involved in the completion of the Vertex work and as a result of the policy of the Corps of Engineers in permitting Lane to submit in turn requests for progress payments based upon similar progress payments to entities supplying work or materials to the project. (U)

50. The quotation of Vertex accepted by Lane required Vertex to complete its work within twelve months. (U)

51. The responsibilities of Vertex under its quotation to Lane involved manufacturing, testing and delivering to the rail site nearest the project site certain items of equipment and material set forth in the Specifications.

52. Pursuant to its quotation to Lane, Vertex manufactured certain items of equipment and material required under the contract but did not undertake all aspects of the work required pursuant to the contract.

53. Pursuant to the terms of the Vertex quotation accepted by Lane, Lane was entitled to request from Vertex the services of a qualified and experienced engineer during the erection and start up of the operation at a per diem rate of $250.00 plus expenses. (U)

54. According to the terms of the Vertex quotation which was accepted by Lane, Vertex was required to prepare shop drawings of the hydraulic gate assemblies and emergency gate assembly which drawings ultimately had to be approved by the Department of the Army Corps of Engineers. (U)

55. The contemplated procedure for acceptance of shop drawings was for Vertex to submit all shop drawings to Lane for review by Lane, and Lane, in turn, to submit the shop drawings to the Department of the Army Corps of Engineers for their approval. The response of the Corps of Engineers was returned to Lane for its review and subsequent return to Vertex. (U)

56. Lane made at most minor changes in the drawings submitted to it by Vertex.

57. Vertex was responsible for resolving all of the engineering details regarding the hydraulic gate and emergency gate assemblies.

58. On several occasions Vertex submitted shop drawings directly to the Department of the Army Corps of Engineers and simultaneously sent copies to Lane. (U)

59. Paragraph 10 of Specification 15A of the contract is entitled "Field Assembly, Installation and Inspection," and provides

for the procedures necessary for field assembly and installation of the hydraulic gates. (U)

60. Specifications 15A and 15B required complete assembly of the hydraulic gates and the emergency gate in the manufacturer's shop so as to permit inspection and testing by the manufacturer in the presence of representatives of the Corps of Engineers. Under the terms of the Vertex quotation which was accepted by Lane, Vertex was the manufacturer to which that portion of Specifications 15A and 15B would have applied. (U)

61. Following assembly and testing by Vertex at its facility, the hydraulic gates and emergency gate were to be disassembled by Vertex and the components match-marked and shipped by Vertex to the rail site nearest the project site for re-assembly and installation in the Dam by Lane. (U)

62. The Specifications required Vertex to match-mark the components so as to prevent improper installation at the project site.

63. Lane was responsible for delivery of the components from the rail site nearest the project site to the project site. (U)

64. Lane was responsible for reassembly of the components and installation of the final units into the Dam. (U)

65. Vertex at no time performed any assembly or installation on the project site.

66. The Department of the Army arranged for inspection of Vertex's work which inspection was performed by the Defense Contracts Administration Services Region, Atlanta, Georgia. (U)

67. Lane never considered fabricating the hydraulic gate and emergency gate assemblies itself because such fabrication is a specialized manufacturing process beyond the capability of Lane during the erection of the dam.

68. Lane did not have the facilities for the manufacture of hydraulic gate assemblies and emergency gate assembly. (U)

69. Under Lane's contract with Vertex, Vertex agreed to perform a specific part of the Prime Contract.

70. In February, 1977 Vertex again requested that Orton furnish a quotation for the hydraulic cylinders required under Specification 15A. (U)

71. On or about February 17, 1977, Orton supplied the quotation requested by Vertex. (U)

72. The quotation directed Vertex to make its order to Parker-Hannifin Corp. c/o The Orton Co. (U)

73. Vertex by an agent orally ordered the cylinders covered by the quotation supplied by Orton.

74. Parker acknowledged Vertex's order for the hydraulic cylinders by sending Vertex an acknowledgment on Parker's Acknowledgment Form which acknowledgment was received by Vertex on March 9, 1977 and which Form further indicated the name Orton under the designation "APR". (U)

75. The designation "APR" is an acrologue for "Area of Prime Responsibility" and is an internal designation used by Parker to indicate the particular sales agent or distributor responsible for the geographic territory in which a particular sale is made.

76. The Parker acknowledgment indicated that the cylinders would be shipped to Vertex by Parker and billed to Vertex by Parker. (U)

77. On or about May 11, 1977, representatives of Lane, Vertex, Parker and Orton met at Vertex's plant to discuss the manufacture of the hydraulic cylinders by Parker and to resolve certain differences between tolerances and dimensions specified by the Corps of Engineers and Vertex and those tolerances and dimensions which Parker felt were attainable under the circumstances.

78. As of the May 11, 1977 meeting, Parker had not begun to manufacture the hydraulic cylinders because of the aforesaid differences in the tolerances and dimensions and because Parker's shop drawings and design calculations had not been approved by the Department of the Army Corps of Engineers.

79. Vertex had been advised prior to the meeting that Parker was unable to commence manufacturing until the differences were resolved and Parker's shop drawings and design calculations were approved by the Department of the Army Corps of Engineers.

80. Edward M. Wheeler, Lane's representative at the May 11, 1977 meeting, advised Kenneth Bracki, Parker's representative, that it was important that Parker commence manufacturing as soon as possible.

81. Lane, Vertex and Parker agreed at the conclusion of the meeting to attempt to resolve the discrepancies and obtain approval of Parker's shop drawings and design calculations from the Department of the Army Corps of Engineers as quickly as possible.

82. Subsequent to the May 11, 1977 meeting, Edward Wheeler telephoned or met with Kenneth Bracki on approximately 6 occasions concerning difficulties in the design demands of the Department of the Army Corps of Engineers.

83. The approximate shipping date for delivery of the cylinders from Parker to Vertex was 18–20 weeks after approval of Parker's shop drawings and design calculations by the Department of the Army Corps of Engineers.

84. Vertex sent a confirming purchase order dated August 15, 1977 for the hydraulic cylinders to Orton in care of Parker at the address of Orton. (U)

85. Vertex's confirming purchase order stated that it was contingent upon approval of certified drawings by the Department of the Army Corps of Engineers. (P–47)

86. Parker's design calculations were not approved by the Department of the Army Corps of Engineers until July 27, 1977 and its shop drawings were not approved by the Department of the Army Corps of Engineers until September 14, 1977. (P–74 and P–82)

87. On September 19, 1977, Vertex received from Parker a written acknowledgment of Vertex's purchase order specifying January 24, 1978 as the scheduled shipment date. (U)

88. The Parker acknowledgment indicated that the cylinders would be shipped to Vertex by Parker and billed to Vertex by Parker. (U)

89. Vertex transmitted some drawings, notes and other communications relating to the hydraulic cylinders by addressing them to The Orton Company or in care of The Orton Company at the address of The Orton Company.

90. Vertex transmitted certain drawings, notes and other communications relating to the hydraulic cylinders by addressing them to Parker in care of Orton. (U)

91. Vertex also transmitted certain drawings, notes and other communications relating to the hydraulic cylinders by sending them to Parker directly. (U)

92. Parker transmitted some drawings, notes and other communications relating to the hydraulic cylinders by addressing them to The Orton Company. (Exhibits D28; D29; D31)

93. Elmer Young, an employee of The Orton Company, received communications for The Orton Company from Vertex and transmitted them to Parker. (U)

94. Elmer Young also received communications for The Orton Company from Parker and transmitted them to Vertex.

95. Certain initial discussions by Vertex regarding the hydraulic cylinders were conducted with Orton or its representatives. (U)

96. Employees of Vertex and Parker had direct communications in regard to the cylinders. (U)

97. Following the inception of the Lane-Vertex contract, Lane's District Manager, Edward M. Wheeler, visited Vertex's plant approximately six times prior to February, 1978. (U)

98. Mr. Wheeler's first visit to Vertex's plant was in the fall of 1976 for the purpose of viewing Vertex's facilities and coordinating Vertex's production schedule with Lane's requirements. (U)

99. Thereafter, Mr. Wheeler visited Vertex's plant on a quarterly basis through the end of 1977 for the purpose of reviewing the progress Vertex had made on the project. (U)

100. At the end of 1977 and the beginning of 1978, Mr. Wheeler began to make monthly visits to the Vertex plant for the purpose of reviewing Vertex's progress. (U)

101. A representative of the Defense Contracts Administration Services Region, Atlanta, Georgia visited Vertex's plant frequently on behalf of the Corps of Engineers to inspect the work in progress and take measurements.

102. A representative of the Department of the Army Corps of Engineers also visited Vertex's plant and pursuant to his request certain changes in Vertex's inspection procedures were made.

103. The manufacturer of the hydraulic cylinders used by Vertex in the manufacture of the hydraulic gate assemblies was Parker. (U)

104. Parker advised Vertex that it would complete its manufacture of the cylinders on December 22, 1977 and the cylinders would then be ready for shipment.

105. On December 22, 1977, Parker prepared Invoice No. 51410813 in the amount of $88,686.22 for the hydraulic cylinders and mailed the invoice on December 22, 1977 or December 23, 1977 to Vertex. (P–12)

106. The cylinders were inspected at Parker's plant on January 11, 1978 by Harold E. McNeil, a representative of the Defense Contracts Administration Services Region, Akron, Ohio. (P–42)

107. The four special hydraulic cylinders and related accessories manufactured by Parker were shipped to Vertex on January 24, 1978. (U)

108. Parker gave Orton a credit memo dated January 10, 1978, in the amount of Five Thousand Four Hundred Eighteen Dollars and Sixty-Seven Cents ($5,418.67) representing commissions to Orton from Parker of which Five Thousand Three Hundred Sixteen Dollars and Forty-Six Cents ($5,316.46) represented the commission for the sale of the hydraulic cylinders. (U)

109. On January 31, 1978, Vertex sent Invoice No. 78–006 to Lane which included charges for the hydraulic cylinders manufactured by Parker. (U)

110. On or before February 4, 1978, the hydraulic cylinders were delivered to Vertex and became a part of Vertex's inventory.

111. On February 7, 1978, Vertex sent to Lane copies of certain documents substantiating Vertex Invoice No. 78–006. (U)

112. One of the documents sent to Lane by Vertex to substantiate Vertex Invoice No. 78–006 was the Parker invoice in the amount of $88,686.22. (P–14)

113. Upon receipt of Vertex Invoice No. 78–006 and the back-up documentation, Lane considered and rejected the issuance of a check payable jointly to Parker and Vertex. (U)

114. On February 17, 1978, Parker sent a copy of Invoice No. 51410813 to Vertex in the amount of $88,686.22. (P–11)

115. Parker sent a letter, dated February 20, 1978, by certified mail, return receipt requested, postage prepaid, to Lane at its office in Meriden, Connecticut, advising Lane that Vertex owed Parker Eighty Eight Thousand Six Hundred Eighty-Six Dollars and Twenty-Two Cents ($88,686.22) for material furnished by Parker to Vertex in connection with the Cowanesque Lake Dam Project, the last of which material having been shipped to Vertex on January 24, 1978. (U)

116. Copies of the foregoing letter were sent by Parker to each of the sureties. (U)

117. On or about February 21, 1978, Vertex filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. (U)

118. Shortly thereafter Orton returned the full amount of its commission to Parker.

119. On February 23, 1978, Lane received notice of Parker's Miller Act claim. (Defendants' response to Plaintiff's requests for admission ¶ 15).

120. Subsequent to the filing of the Chapter XI petition, Lane advanced at least $19,000 to Vertex for the purpose of covering Vertex's payroll.

121. On March 20, 1978, Lane, Vertex and Citizens and Southern Emory Bank of Atlanta, Georgia, entered into an agreement (hereinafter "Chapter XI Agreement"), which agreement was approved by the Federal Bankruptcy Court for the Northern District of Georgia. (U)

122. Under the Chapter XI Agreement, the terms of the Vertex quotation which had been accepted by Lane were abrogated and a new basis for completion of Vertex's work was accepted. (U)

123. Under the Chapter XI Agreement, Lane paid Vertex an hourly rate for the labor needed to complete the work Vertex had contracted to perform for Lane.

124. Representatives of Lane made weekly visits to Vertex's plant following the execution of the Chapter XI Agreement to audit Vertex's payroll.

125. Lane did not take control of the operations of Vertex.

126. The only efforts of Lane with regard to the operations of Vertex involved attempts to expedite the completion of the work being performed by Vertex for Lane.

127. Lane did not supervise the manufacturing or production processes at the Vertex shop.

128. In order to expedite completion of the project, Lane obtained the agreement of the Department of the Army to waive the requirement that certain tests of the hydraulic gate assemblies and emergency gate assembly be performed in Vertex's factory, provided that tests were performed at the project site. (U)

129. Prior to shipment of the hydraulic gate assemblies and the emergency gate assembly, Vertex did perform certain of the shop tests which were required. (U)

130. Pursuant to an agreement among Lane, Vertex and a Georgia bank, the cylinders were delivered to Lane from the Vertex inventory. (U)

131. The agreement to deliver the hydraulic cylinders to Lane from the Vertex inventory was approved by the Bankruptcy Trustee as well as by the Bankruptcy Court. (U)

132. The procedures for testing the hydraulic gate assemblies and emergency gate assembly were developed by Vertex. (P–22)

133. Certain tests which were to have been performed at Vertex's shop were subsequently performed at the project site by Lane. (U)

134. On one occasion a Vertex employee did supervise work conducted on the project site in relation to straightening a metal guide which had been bent in transit. (U)

135. The hydraulic cylinders manufactured by Parker were incorporated into the concrete of the dam by Lane. (U)

136. At the present time, Lane does not owe Vertex any money under the terms of the Vertex quotation which was accepted by Lane. (U)

137. There was a substantial cost overrun by Vertex on its contract with Lane.

138. Department of the Army contracts include labor requirements mandating completion of form 1566 for each subcontractor on the project.

139. No form 1566 was ever prepared for Vertex or by Vertex nor was such a form ever requested by the Corps of Engineers.

140. Department of the Army contracts additionally require numerous other labor, wage and other procedures regarding each subcontractor of a prime contractor.

141. No such labor, wage or other procedures were either communicated to or required of Vertex.

142. Lane perceived Vertex as a material supplier only, at least for purposes of the Corps of Engineers requirements relating to subcontractors found in Armed Services Procurement Regulation 7–602.37 (D–16).

143. Vertex acknowledges an indebtedness to Parker for the cylinders manufactured by Parker in the amount of Eighty-

Eight Thousand Six Hundred Eighty-Six Dollars and Twenty-Two Cents ($88,686.22).

144. On the Schedule of Creditors filed with the United States District Court for the Northern District of Georgia in Vertex's Chapter XI proceeding, Vertex listed Parker as a creditor to which it owed $88,-686.22. (P–67)

145. Lane never paid any money to Vertex or to Parker for the cylinders manufactured by Parker.

146. After the filing of the bankruptcy petition Lane paid Vertex's labor costs in connection with the project.

147. Lane's relationship with Vertex lasted until December, 1978. (P–80)

148. The hydraulic and emergency gate assemblies fabricated by Vertex were complex mechanisms of great importance to the proper functioning of the Cowanesque Lake Dam.

### III. Discussion.

In 1976, Defendant Lane Construction Corporation (Lane) was awarded the contract by the United States Army Corps of Engineers to construct a dam which was to be part of the Corps of Engineers' Cowanesque Lake Dam Project in Tioga County, Pennsylvania. As a part of the project, Lane was required by the Corps of Engineers to construct an intake tower through which the flow of water from the lake would be regulated by various metal gates. Lane contracted with Vertex Systems, Inc. (Vertex) for the construction of those gates and Vertex in turn secured the hydraulic cylinders which were required to operate the gates from the Plaintiff in interest in this case, Parker-Hannifin Corporation (Parker). Subsequent to Parker's shipment of the cylinders to Vertex, Vertex filed a petition in bankruptcy and Parker has not been paid for manufacture of the cylinders. Consequently, after giving timely notice to Lane and its sureties, Parker brought this action under the Miller Act, 40 U.S.C. § 270a et seq., seeking to recover against the bond which Lane was required to post for the protection of certain classes of subcontractors, material supplies and laborers

enumerated in the Miller Act. Parker asserts that it is entitled to recover because it enjoyed a direct contractual relationship with a sub-contractor to Lane or, in the alternative, that Parker should be reimbursed by Lane on a theory of unjust enrichment. Lane has asserted two defenses to Parker's Miller Act claim, contending first that Vertex was not a sub-contractor of Lane's but rather a material supplier so that regardless of the relationship between Vertex and Parker, Parker is not entitled to recover under the Miller Act and, second, that even if Vertex were a sub-contractor, Vertex's order for the hydraulic cylinders ran to the Orton Company which in turn acquired the cylinders from Parker so that Parker had no direct contractual relationship with Vertex thus barring it from recovery under the Act. Additionally, Lane asserts that there is no basis for Parker's claim that it is entitled to recover under a theory of unjust enrichment. The Court will deal with these issues *seriatim.*

The first and most important issue to be decided by the Court in this case is whether Vertex was a subcontractor within the meaning of the Miller Act. The provisions of 40 U.S.C. § 270a which were in effect in 1976 required a contractor such as Lane who was awarded a government contract in an amount exceeding $2,000 to furnish to the United States a bond for the protection of all persons supplying labor and material in the prosecution of the work. 40 U.S.C. § 270b(a) states that every person who has furnished labor or material for the completion of such a project and who has not been paid in full has the right to sue on the bond, provided, however, that any person with a direct contractual relationship with a subcontractor also has a right to sue on the bond. Section 270b(a) and its proviso have been interpreted to limit recovery on a payment bond posted under the Miller Act to those materialmen, labor, and subcontractors who deal directly with the prime contractor and, additionally, to those persons who, although they have no direct or implied contractual relationship with the prime contractor, deal directly with a subcontractor. *Clifford F. MacEvoy Co. v.*

United States ex rel. Calvin Tomkins Co., 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944). The policy of the limitation on the class of persons who can sue under a Miller Act bond is to permit the prime contractor to protect himself by requiring the relatively few sub-contractors who perform substantial portions of the prime contract to post bonds, thus insuring that their materialmen, subcontractors, or laborers will be paid in the event that the subcontractor defaults. *See Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.,* 322 U.S. 102, 107–108, 64 S.Ct. 890, 88 L.Ed. 1163 (1944). Consequently, should the Court determine in this case that Vertex was not a subcontractor but rather a material supplier, Parker would be precluded from recovering against the Defendants under the Miller Act.

In *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.,* 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944), the Supreme Court indicated that the word "subcontractor" as used in the Miller Act is to be interpreted in its technical sense and was intended by Congress to distinguish a subcontractor from either a laborer or material supplier. The Court defined subcontractor as "one who performs for and takes from the prime contractor a specific part of the labor and material requirements of the original contract . . . ." *Clifford F. MacEvoy v. United States ex rel. Calvin Tomkins Co.,* 322 U.S. 102, 109, 64 S.Ct. 890, 894, 88 L.Ed. 1163 (1944). In *MacEvoy,* however, the Court was not faced with the difficult task of deciding whether a particular party was a subcontractor within the meaning of the Act. Rather, the facts of the case contain no indication that James H. Miller and Company, the party which came in the contractual line between the plaintiff and the prime contractor, agreed to perform or did perform any part of the work on the construction project. Thus, the exact contours of the subcontractor test laid down in *MacEvoy* must be determined by reference to later decisions.

The Supreme Court had occasion to address the subcontractor test set forth in *MacEvoy* in *F. D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974). In that case, the prime contractor had been awarded contracts to construct a number of federal housing projects from 1961 through 1968 and from 1963 through 1966 relied upon Cerpac, a lumber company, to supply the major portion of its plywood and millwork requirements. Cerpac was awarded two contracts by the prime contractor on a 1965 housing project which called both for the supply of standard plywood and the installation of custom millwork. In connection with that project, Cerpac placed an order with the Plaintiff for plywood and when the Plaintiff was not paid, it sued the prime contractor under the Miller Act. In determining that Cerpac was a subcontractor within the meaning of the act, the Court indicated that the test set forth in *MacEvoy* was a functional one and that the key to the test is the substantiality of the alleged subcontractor's performance and its importance in relationship to the entire project. In that case, because Cerpac not only supplied certain standard items of plywood to be incorporated into the project but also did custom milling and took over a part of the contract requirements from the prime contractor, Cerpac was determined to be a subcontractor within the meaning of the Miller Act. The Court also noted that a finding that Cerpac was a subcontractor was not antithetical to the purposes of the Miller Act because there was a close and longstanding relationship between the prime contractor and Cerpac and, consequently, the prime contractor was in a position to require that Cerpac post a bond protecting the prime contractor in the event that Cerpac failed to pay its own subcontractors, laborers, or material suppliers.

In addition to the *Rich* case, a number of lower courts have had occasion to apply the *MacEvoy* test in determining whether a particular party is a subcontractor within the meaning of the Miller Act. Because, as indicated by the decision in *Rich,* the question of whether a company is a subcontractor as opposed to a material supplier is basically a factual determination, it is diffi-

cult to gather from the cases decided under the Miller Act a general rule of law which is dispositive of any particular case. However, it is possible to identify from the various decisions certain factors which the Courts have considered to be important in determining whether or not a particular party is a subcontractor or a material supplier.

One of the most important factors to consider is the nature of the material or service supplied by the alleged subcontractor to the prime contractor. For example, a party who supplies fungible goods which are a part of his general inventory, such as sand and gravel, and the production of which does not require a specialized or customized manufacturing process in order to meet specifications of the prime contract is generally held to be a material supplier rather than a subcontractor regardless of the relationship of the cost of the materials which he supplies to the cost of the entire project. *See, e. g. Brown & Root, Inc. v. Gifford-Hill & Co.,* 319 F.2d 65 (5th Cir. 1963); *United States ex rel. Pioneer Steel Co. v. Ellis Construction Co.,* 398 F.Supp. 719 (E.D.Tenn.1975). On the other hand, if an item is to be custom manufactured by the purported subcontractor according to the specifications found in the prime contract and the purported subcontractor bears a portion of the responsibility for the design and fabrication of the goods including the responsibility to prepare shop drawings in accordance with prime contract specifications, then it is likely that the relationship between the prime contractor and the purported subcontractor is sufficient to justify recovery by the latter's material suppliers under the Miller Act. *See, e. g., United States ex rel. Gulfport Piping Co. v. Monaco & Son, Inc.,* 222 F.Supp. 175 (D.Md.1963), *rev'd on other grounds,* 336 F.2d 636 (4th Cir. 1964). Of course, custom manufacturing by itself is not sufficient. To a certain extent, every material supplier is required to provide to the prime contractor materials in accordance with contract specifications. Thus, in *Aetna Casualty & Surety Co. v. United States ex rel. Gibson Steel Co.,* 382 F.2d 615 (5th Cir. 1967), the Court found a contractor-subcontractor relationship lacking between the prime contractor and the purported subcontractor because although the latter performed custom manufacturing, none of the items which it made were complex but rather consisted of simple components such as stairs and ladders. The Court did indicate, however, that the fact that the purported subcontractor was required to prepare the shop drawings and that it had no inventory of the items to be produced weighed on the side of a finding that a contractor-subcontractor relationship existed. *See also Miller Equipment Co. v. Colonial Steel & Iron Co.,* 383 F.2d 669 (4th Cir. 1967), *cert. denied,* 390 U.S. 955, 88 S.Ct. 1049, 19 L.Ed.2d 1148 (1968).

The essential facts relating to whether Vertex was a subcontractor in this case are as follows. First, on the material supplier side of the balance, Vertex's contract with Lane as originally agreed to contemplated the performance of work for which Vertex was to be paid $726,500 or about 2% of the total dollar amount of the contract entered into between Lane and the Corps of Engineers. Vertex was not required to perform any installation of the gates in the intake tower or any other significant on-site work. Rather, Vertex's obligation with respect to the gates ended when they were delivered to the rail site nearest to the dam project. On the subcontractor side, however, Lane gave Vertex the responsibility of performing particular identifiable parts of the contract with the Corps. Vertex was required to prepare or to have one of its subcontractors or material suppliers supply shop drawings to be submitted to the Corps of Engineers and Vertex participated in discussions related to the shop drawings as Lane's equal. The gates were not stock items but rather had to be manufactured according to Corps specifications and Lane conceded that it had no facilities available for the manufacture of such gates. Additionally, the gates were items that, once constructed, could not be used for any purpose other than functioning in the intake tower of this particular claim. Finally, the hydraulic gates in this case are

an important part of the entire dam structure. The gates, which regulate the flow of water through the intake tower, permit the dam to regulate with some precision the water level behind the dam and the rate of flow of water into the river downstream. This Court was not impressed with Lane's witnesses' assertion that the dam would perform its essential function, namely the impounding of water, whether the gates were in place or not. It is the Court's view that the functioning of a particular item can be described in a number of ways and that one can by definition minimize the importance of certain features which are in reality essential to the item's function. Thus, for example, it may be said that the purpose of a wind instrument is to make sound and it will perform that function whether or not it contains devices such as keys and holes to produce different notes. Nevertheless, without some means of regulating the passage of air through a wind instrument it does not perform its essential function. The same can be said of the Cowanesque Dam. Without the gates manufactured by Vertex, the dam would be at best a crude instrument for the impounding of water and would not be able to regulate either the water level behind the dam or the flow of water through the dam in as precise a manner as it can if the gates be in place. It is the latter features, namely the importance of the gates to the overall project and the fact that Vertex was required to custom-manufacture the gates to Corps specifications and in general to be responsible for assuring that the gates met such specifications which convince this Court that Vertex's relationship to Lane was that of a subcontractor to a contractor. The Court agrees with Parker that the facts of this case are extremely similar to those presented to the United States Court of Appeals for the Second Circuit in *United States ex rel. Wellman Engineering Co. v. MSI Corp.*, 350 F.2d 285 (2d Cir. 1965). In that case, the prime contractor engaged Seneca, the alleged subcontractor, to manufacture a hydraulic system for opening and closing the doors on a missile launcher. Seneca had no responsibility to perform any on-site construction or to install the system. The Plaintiff in that case supplied certain parts to Seneca for the system for which Seneca did not pay. The Court concluded, based upon the degree of responsibility assumed by Seneca to insure that the parts which it manufactured complied with government specifications and the type of work involved including the construction of items not generally available, that Seneca was a subcontractor. This Court concludes that Vertex as a subcontractor within the meaning of the Miller Act and that any party standing in a direct contractual relationship to Vertex is entitled to maintain an action on the bond posted by Lane.

■ The finding that Vertex was a subcontractor within the meaning of the Miller Act does not end the Court's inquiry into whether Parker is entitled to recover in this case. Lane also asserted and litigated at trial the issue of whether Vertex contracted directly with Parker for the manufacture of the cylinder or whether a third party, the Orton Company, broke the contractual chain between Vertex and Parker so as to preclude Parker from recovering under the Miller Act. Again, the determination of whether Parker and Vertex had a direct contractual relationship is primarily a factual one. The evidence produced in this case indicates that Vertex originally solicited an offer relating to the manufacture of the cylinders from the Orton Company. However, it was clear that from the outset of the relationship between Orton and Vertex Orton was acting not in its capacity as a distributor for certain products manufactured by other companies, as it did from time to time, but in its capacity as a sales agent or manufacturer's representative for Parker. Orton specifically advised Vertex that all communications were to be addressed to the Parker-Hannifin Corporation in care of the Orton Company. Parker communicated directly with Vertex on a number of occasions, including sending invoices directly to Vertex and shipping the completed cylinders to Vertex's plant. Orton never billed Vertex. Further, Orton

was paid a commission on the sale by Parker which Orton ultimately refunded when Parker's bill was not paid by Vertex. The facts do not present a situation where Orton, acting as an independent distributor, purchased the cylinders from Parker and then sold them to Vertex. *Cf. United States ex rel. Hasco Electrical Corp. v. Reliance Ins. Co.,* 390 F.Supp. 158 (E.D.N.Y. 1975). Rather, when viewing the substance of the transaction involving Vertex, Orton, and Parker, see *Glens Falls Ins. Co. v. Newton Lumber & Mfg. Co.,* 388 F.2d 66 (10th Cir. 1967), *cert. denied,* 390 U.S. 905, 88 S.Ct. 821, 19 L.Ed.2d 873 (1968), the Court is convinced that there was a direct contractual relationship between Parker and Vertex relating to the manufacture of the cylinders.

The Court's conclusion that the relationship between Vertex and Lane is that of subcontractor and contractor with respect to the manufacture of the gates to be incorporated into the Cowanesque Lake Dam Project and that Parker had a direct contractual relationship with Vertex entitles Parker to recover on the bond the money owing to it by Vertex for the manufacture of the cylinders supplied by Parker to Vertex to be incorporated into the gate assemblies. Because Parker has prevailed on its Miller Act claim, it is unnecessary for the Court to consider whether in the alternative Parker would be entitled to recover directly from Lane under the theory of unjust enrichment. Based upon the foregoing, the Court reaches the following

IV. Conclusions of Law.

1. Vertex Systems, Inc. was a subcontractor of Lane Construction Corporation, the prime contractor on the Cowanesque Lake Dam Project, with respect to Vertex's agreement to furnish to Lane hydraulic gate assemblies to be incorporated into the intake tower of the dam.

2. Parker-Hannifin Corporation was a material supplier which had a direct contractual relationship with Vertex Systems, Inc. relating to the furnishing of hydraulic cylinders to be incorporated into the gates which Vertex agreed to manufacture for Lane.

3. Parker is one of those material suppliers which are protected by the payment bond posted by Lane as required by the Miller Act, 42 U.S.C. § 270a et seq.

4. Parker is entitled to recover against the Defendants the sum of $88,686.22 plus interest from February 28, 1978 at the rate provided by law.