687 F.2d 129
 30 Cont.Cas.Fed. (CCH) 70,217
 UNITED STATES of America for the Use and Benefit of
CONSOLIDATED PIPE AND SUPPLY COMPANY, Plaintiff-Appellee,
v.
MORRISON-KNUDSEN COMPANY, INC., Fischback & Moore, Inc., and
American Bridge(Div. of U. S. Steel Corp.) a joint venture;
INA Reinsurance Company, a Delaware corporation; Reliance
Insurance Company, a Pennsylvania corporation, Defendants-Appellants.
 No. 81-5310.*
 United States Court of Appeals,
Sixth Circuit.
 Argued June 17, 1982.
Decided Aug. 12, 1982.
 
 H. Frederick Humbracht, Jr., James L. McElroy, Nashville, Tenn., for defendants-appellants.
 James R. Buckner, Miller & Martin, Raymond R. Murphy, Jr., Chattanooga, Tenn., for plaintiff-appellee.
 Before LIVELY and KRUPANSKY, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 KRUPANSKY, Circuit Judge.
 
 
 1
 This action was initiated pursuant to the Miller Act, 40 U.S.C. § 270a et seq. by plaintiff Consolidated Pipe and Supply Company (Consolidated Pipe) seeking recovery on a payment bond executed by defendants Morrison-Knudsen Company, Inc., Fischback & Moore, Inc., and American Bridge (collectively Joint Venture) as principals and INA Reinsurance Company and Reliance Insurance Company as sureties (collectively Sureties).
 
 
 2
 Joint Venture, as a general contractor, executed a $260,996,400 construction contract (prime contract) with the United States for the construction of the Aero Propulsion Test Facility at the Arnold Engineering Development Center, Tullahoma, Tennessee. Defendants INA Reinsurance Company and Reliance Insurance Company are sureties under the bond required by 40 U.S.C. § 270a and issued as part of the general contract. Joint Venture's successful bid for the prime contract incorporated bids from purchase order suppliers and subcontractors including a bid from DGI Pipe Fabrications (DGI or middle party) to provide fabricated pipe. Joint Venture issued a purchase order to DGI in the amount of $5,537,072 to furnish fabricated pipe for construction package No. 2 "site and utilities preparation" and package No. 4 "piping and equipment installation" as specified by the prime contract. It was necessary that a part of the pipe for package No. 2 be coated, wrapped and lined to comply with government specifications. DGI in turn issued purchase orders to other companies to supply and conform the pipe to the government's requirement. One such purchase order was issued by DGI to Consolidated Pipe to coat, wrap and line pipe in accordance with the terms and conditions of the prime contract. DGI failed to compensate Consolidated Pipe for performing this work whereupon the instant action was initiated. The district court concluded that DGI was a subcontractor rather than a materialman resulting in the liability of Joint Venture and the Sureties under the Miller Act for the amount owed by DGI to Consolidated Pipe, $114,155 plus 8% interest. This appeal ensued.
 
 
 3
 The Miller Act, 40 U.S.C. § 270a et seq., requires a prime contractor of a federal project to furnish a payment bond to insure payment to individuals who supply labor and/or materials for federal projects. Section 270a pertinently provides:
 
 
 4
 (a) Before any contract ... for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as "contractor":
 
 
 5
 (2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person.
 
 
 6
 Like its predecessor the Heard Act of August 13, 1894, ch. 280, 28 Stat. 278, as amended, Act of February 24, 1905, 33 Stat. 811, the Miller Act is designed to provide an alternative remedy to the mechanics' liens ordinarily available on private construction projects. J. W. Bateson Co., Inc. v. United States, 434 U.S. 586, 589, 98 S.Ct. 873, 875, 55 L.Ed.2d 50 (1978); F. D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc., 417 U.S. 116, 122, 94 S.Ct. 2157, 2161, 40 L.Ed.2d 703 (1974). As such,
 
 
 7
 The Miller Act, like the Heard Act, is highly remedial in nature. It is entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects.
 
 
 8
 Clifford F. MacEvoy Co. v. United States, 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163 (1944). Accord: United States ex rel. General Electric Supply Co. v. Wiring, Inc., 646 F.2d 1037, 1042 (5th Cir. 1981). However, the class of laborers and material suppliers within the protective ambit of the Miller Act is limited by the proviso of § 270b(a) which provides:
 
 
 9
 (a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under section 270a of this title and who has not been paid ... shall have the right to sue on such payment bond for the amount ... due him: Provided, however, That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice...
 
 
 10
 Accordingly, § 270b(a) limits the right to initiate a suit on the payment bond to
 
 
 11
 (1) those materialmen, laborers and subcontractors who deal directly with the prime contractor and (2) those materialmen, laborers and sub-contractors who, lacking express or implied contractual relationship with the prime contractor, have a direct contractual relationship with a subcontractor and who give the statutory notice of their claims to the prime contractor. (emphasis added)
 
 
 12
 MacEvoy, supra, 322 U.S. at 107-08, 64 S.Ct. at 894. Individuals with a more remote relationship do not come within the purview of the Act. As the Supreme Court has observed,
 
 
 13
 Congress cannot be presumed, in the absence of express statutory language, to have intended to impose liability on the payment bond in situations where it is difficult or impossible for the prime contractor to protect himself.
 
 
 14
 MacEvoy, supra, 322 U.S. at 110, 64 S.Ct. at 895. Further,Many such materialmen are usually involved in large projects; they deal in turn with innumerable sub-materialmen and laborers. To impose unlimited liability under the payment bond to those sub-materialmen and laborers is to create a precarious and perilous risk on the prime contractor and his surety.
 
 
 15
 Id. See also: Bateson Co., supra (sub-subcontractors are not "subcontractors" within the meaning of the Miller Act).
 
 
 16
 In the instant action Consolidated Pipe had no "express or implied contractual relationship" with the prime contractor, Joint Venture, but was instead retained by DGI to coat, wrap and line pipe. The narrow issue joined in this appeal is whether DGI is a "subcontractor" or a materialman within the intent of the Act. Although the Miller Act offers no definition of these terms, the legislative history of the Act discloses that Congress intended the common and accepted meanings as used by the building trades wherein
 
 
 17
 a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen.
 
 
 18
 MacEvoy, supra, 322 U.S. at 109, 64 S.Ct. at 894. This technical definition was supplemented in F. D. Rich Co., Inc. v. United States, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974) wherein the Supreme Court examined the "substantiality and importance" of the relationship between the prime contractor and the "subcontractor" to determine the status of the latter within the context of the Miller Act, since:
 
 
 19
 It is the substantiality of the relationship which will usually determine whether the prime contractor can protect himself, since he can easily require bond security or other protection from those few "subcontractors" with whom he has a substantial relationship in the performance of the contract.
 
 
 20
 417 U.S. at 123-24, 94 S.Ct. at 2162.
 
 
 21
 The "relationship" between DGI and Joint Venture in the action sub judice is reflected in the following unchallenged district court findings of fact:
 
 
 22
 1. * * * The Joint Venture, as a general contractor, entered into a construction contract ("prime contract") with the United States of America ... for the construction of the Aero Propulsion Test Facility at the Arnold Engineering Development Center, ...
 
 
 23
 2. * * * The prime contract between the Corps of Engineers and Joint Venture totalled $260,996,400.00.... Joint Venture issued a purchase order to DGI in the amount of $5,537,072.00 providing that DGI was to provide fabricated pipe for construction package No. 2 "site and utilities preparation" and package No. 4 "piping and equipment installation" of the prime contract. This pipe represented approximately 40% of the pipe used on the total project. It was necessary that a portion of the pipe for package No. 2 be coated, wrapped and lined to comply with government specifications. DGI did not perform this process, but instead issued purchase orders to other companies to supply this coating. One such purchase order was issued by DGI to Consolidated Pipe & Supply Co. ("plaintiff"). DGI failed to pay plaintiff for coating this material....
 
 
 24
 3. The process of fabrication involves taking straight pipe from the manufacturer, cutting it into predetermined lengths and adding fittings, 90 degree elbows, 45 degree elbows, inlets, outlets, saddles and offsets of pertinences to make it conform to contract specifications. Fabricated pipe cannot be purchased off the shelf. DGI fabricated the pipe at its facilities in Texas and the pipe was then sent to the project site.
 
 
 25
 4. The purchase order to DGI provided that DGI was to fabricate the pipe in accordance with the specifications of the prime contract in which the Corps of Engineers had designed the pipes and selected the type of materials to be used. These fabrication requirements were supplied to DGI in the form of general two dimensional drawings. From these drawings DGI drafted isometric drawings (three dimensional drawings) which were utilized in preparing shop drawings. The shop drawings gave a more detailed picture of segments of the isometric drawings and were used for actual fabrication of the pipe. Preparation of these drawings by DGI involved no design work, but did require engineering expertise on behalf of DGI that Joint Venture did not have. The purchase order required that these shop drawings be submitted to Joint Venture for approval before DGI could begin fabrication. Some drawings were approved immediately; others were sent back to DGI for revision and then had to be resubmitted. During the period of the DGI contract, the Joint Venture submitted to DGI for review and repricing 154 change order requests, totalling $1,500,000.00.
 
 
 26
 5. DGI sent a draftsman to the project site when the drawings were first submitted to participate in the interpretation of the drawings. He stayed approximately six weeks.
 
 
 27
 6. DGI did not maintain an inventory of pipe and accordingly had to purchase the pipe from various manufacturers. About one-third of the pipe which DGI was to provide under the contract required no fabrication so DGI would purchase that pipe from the manufacturer and it would be shipped directly to the project site without going through DGI's facilities. These straight lengths could be shipped without drawing approval.
 
 
 28
 7. DGI did not install the pipe but did have a representative at the site for approximately one year to examine the pipe as it arrived in order to determine whether any damage had occurred in shipping. If a defect was discovered, Joint Venture would correct it or hire someone to correct it, if the DGI representative approved the repairs. DGI never repaired any work on the job site, but any repair costs were deducted from the DGI contract price.
 
 
 29
 8. Joint Venture issued approximately 1200 purchase orders and 39 subcontracts. The contract between Joint Venture and DGI was designated by the parties as a purchase order. The prime contract required that all subcontractors submit certified payrolls to the United States Corps of Engineers. Purchase order suppliers were not required to submit payrolls. DGI did not submit their payrolls to the Corps of Engineers.
 
 
 30
 9. The bulk of the 1200 purchase orders were for less than $50,000.00, and about 95% of the purchase orders had no performance bond. The purchase order with DGI originally included a performance bond. However, this provision was taken out by Daniel Lee, Senior Vice President for DGI, because the parties agreed that if DGI's bid was cut 10%, no performance bond would be required. The criteria for determining which companies were required to secure performance bonds is unclear. Numerous employees of Joint Venture stated they were surprised when they found out the DGI had not secured a performance bond. One employee said that it was unusual to have a purchase order of this size without performance bond. Mr. Gentry, President of DGI, stated that a performance bond was not required as his company was a vendor, not a subcontractor.
 
 
 31
 10. The purchase order between Joint Venture and DGI provided that the government would make progress payments monthly as the work proceeded on estimates approved by the contracting officer. Mr. Gentry stated that DGI sent invoices based on work actually completed or materials purchased and billed Joint Venture a flat amount for each ton shipped. During the entire existence of the DGI contract, Joint Venture held out a 10% retention of all amounts invoiced by DGI, pursuant to a provision in the prime contract which allowed such retention until final completion and acceptance of the contract work. At one point, this amount arose to $174,907.73.
 
 
 32
 11. Prior to the start of the contract, representatives of both Joint Venture and the Corps of Engineers inspected DGI's facilities to see that it could perform the work as required by the purchase order. Also, a quality control manager for Joint Venture inspected DGI facilities and DGI's quality control program had to be submitted to the Corps of Engineers for approval. Joint Venture also required DGI to transmit to them any and all copies of purchase orders from their suppliers and the DGI contract prohibited DGI from subcontracting any portion of their work without prior approval of Joint Venture. A representative of Joint Venture visited plaintiff's facilities.
 
 
 33
 12. Joint Venture, the individual defendants, or their subsidiaries had no business dealings or relationships with DGI prior to the letting of this job.
 
 
 34
 In ascertaining whether this relationship between DGI and Joint Venture is that which was envisioned in MacEvoy and F. D. Rich Co., it is instructive to identify and weigh those factors which militate in support of the conclusion that the middle party is a "subcontractor" with those which are indicative of "materialman" status. See: Aetna Casualty & Surety Co. v. United States, 382 F.2d 615 (5th Cir. 1967); United States v. Lane Construction Corp., 477 F.Supp. 400 (M.D.Pa.1979). The entire relationship between the subcontractor and the prime contractor must be examined. F. D. Rich Co., supra. As will be selectively discussed in greater detail below, the following factors reflect upon the status of DGI within the context of this case: DGI custom fabricated an integral system of non-inventory pipe in conformity with complex specifications established in the prime contract; the fabrication and delivery of this pipe required an integrated, detailed, and continuing relationship between DGI and Joint Venture; DGI was backcharged for defective material; Joint Venture could have protected itself from liability by requiring DGI to post an appropriate bond; DGI did not participate in the design of the project; DGI neither installed nor supervised the installation of the material; no performance bond was required; DGI was not a licensed contractor in Tennessee; the contractual instrument was styled a "purchase order"; DGI invoiced and was paid for some materials purchased and shipped rather than being paid on a percentage of completion or progress payments. Balancing these factors in a remedial nature, it is apparent that DGI was a subcontractor.
 
 
 35
 Since "the word (subcontractor) has no single, exact meaning", MacEvoy, supra, 322 U.S. at 108, 64 S.Ct. at 894, the presence or absence of such term in the contractual agreement between the prime contractor and the middle party is not controlling of the "subcontractor" issue and such indicia has properly been afforded de minimus probative value. United States ex rel. Bryant v. Lembke Construction Co., 370 F.2d 293, 296 (10th Cir. 1966); United States ex rel. Wellman Engineering Co. v. MSI Corp., 350 F.2d 285 (2d Cir. 1965); United States ex rel. Gulfport Piping Co. v. Monaco & Son, Inc., 222 F.Supp. 175 (D.Md.1963), rev. on other grounds, 336 F.2d 636 (4th Cir. 1964) ("purchase order"); Miller Equipment Co. v. Colonial Steel & Iron Co., 383 F.2d 669, 674 (4th Cir. 1967) ("purchase order"), cert. denied, 390 U.S. 955, 88 S.Ct. 1049, 19 L.Ed.2d 1148 (1968).[1]
 
 
 36
 The nature of the material and the work performed by DGI are highly indicative of that of a subcontractor. The materials supplied were not inventory items, a factor denominative of a subcontractor relationship. MSI Corp., supra; Lane Construction Corp., supra; Monaco & Son Inc., supra; Lembke Construction Co., supra. Rather, DGI custom fabricated pipe in accordance with the specifications in the prime contract. Although custom fabrication is not per se sufficient to establish the relationship of responsibility and importance necessary to render a middle party a subcontractor, Aetna Casualty & Surety Co., supra, Ellis Construction Co., supra, such factor must be afforded substantial qualitative weight in support of finding a "subcontractor" status. MSI Corp., supra; Miller Equipment Co., supra; Lane Construction Corp., supra.[2]
 
 
 37
 The high decree of responsibility undertaken by DGI to assume an identifiable portion of the prime contract weighs heavily in favor of finding DGI to be a subcontractor. DGI was required to provide fabricated pipe for construction package No. 2 "site and utilities preparation" and package No. 4 "piping and equipment installation", which collectively represented approximately 40% of the pipe used on the total project. This enormous responsibility necessitated a detailed, intricate and continuing relationship between DGI and Joint Venture. DGI was required to submit thousands of shop drawings to Joint Venture for approval to assure that the pipe conformed to the specifications of the prime contract, a clear "subcontractor" factor. Aetna Casualty & Surety Co., supra; Monaco & Son, Inc., supra; Lane Construction Corp., supra. A DGI representative was present at the project site to assist in the interpretation of these drawings. A DGI draftsman was also present at the project site to inspect the pipe as it arrived and approve any modifications required by Joint Venture; DGI was backcharged by Joint Venture for the cost of repairing unacceptable materials, indicative of "subcontractor" status. Aetna Casualty & Surety Co., supra.
 
 
 38
 A significant and probative consideration in resolving DGI's status within the intent and purpose of the Miller Act is "whether the prime contractor (could have) protect(ed) himself" against loss by requiring an appropriate bond or other security from the "subcontractor", F. D. Rich Co., supra, 417 U.S. at 123, 94 S.Ct. at 2162, or whether such protection would have been "difficult or impossible." MacEvoy, supra, 322 U.S. at 110, 64 S.Ct. at 895. Joint Venture issued approximately 1200 purchase orders and 39 subcontracts. The overwhelming majority of the 1200 purchase orders issued to other entities furnishing labor and material to the project were for commitments of less than $50,000 and in approximately 95% of these orders no performance bond was provisioned. The purchase order from Joint Venture to DGI, however, was issued in the amount of $5,537,072, far in excess of the value of the vast majority of purchase orders.[3] Only a handful of purchase orders in excess of $1,500,000 were executed without a performance bond.[4] A performance bond, as opposed to a payment bond, was originally incorporated into the purchase order to DGI and subsequently deleted in favor of a reduced contract price. It is obvious that a payment bond could have as easily been the subject of negotiations. The financial magnitude of this purchase order, in conjunction with the detailed and continuing relationship which existed between DGI and Joint Venture during the negotiation of and execution of the contract, placed the prime contractor in a position in which it could have and, in hindsight, should have protected itself from loss by requiring DGI to post an appropriate bond or other security. The material suppliers of DGI cannot be categorized as those remote entities which Congress sought to exclude from the protective ambit of the Miller Act so as to avoid "unlimited liability under the payment bond." MacEvoy, supra, 322 U.S. at 111, 64 S.Ct. at 895. Rather, DGI was one of those "few 'subcontractors' " which Joint Venture could have "easily require(d) bond security or other protection from". F. D. Rich Co., supra, 417 U.S. at 123, 94 S.Ct. at 2162.
 
 
 39
 In sum, an examination of the entire relationship between DGI and Joint Venture discloses that the latter is a Miller Act "subcontractor". Consolidated Pipe is therefore embraced by the statute and entitled to recover upon the payment bond posted by Joint Venture and the Sureties. Accordingly, the judgment of the district court is hereby AFFIRMED.
 
 
 
 *
 A brief of The Associated General Contractors of America, Inc., as Amicus Curiae, has been filed imploring this Court to adopt a functional approach to differentiating between a subcontractor and a materialman within the context of the Miller Act. Hopefully this decision will clarify the outer perimeters of the Miller Act and implement, to the extent possible, a measure of predictability
 
 
 [1]
 Notably,
 The definition of "subcontractor" fixed by the MacEvoy case is an empirical one. This Court has specifically said that substance, not form, controls (cites omitted).... (W)hat transpired and how the prime contract was actually performed is what is important and what controls, and not the labels the parties attached to their relationship...
 United States v. Monaco & Son, Inc., 222 F.Supp. 175, 181 (D.Md.1963), rev. on other grounds, 336 F.2d 636 (4th Cir. 1964).
 
 
 [2]
 As has been observed of "custom manufacturing", a concept closely analogous to custom fabrication as presented in this action:
 (I)f an item is to be custom manufactured by the purported subcontractor according to the specifications found in the prime contract and the purported subcontractor bears a portion of the responsibility for the design and fabrication of the goods including the responsibility to prepare shop drawings in accordance with prime contract specifications, then it is likely that the relationship between the prime contractor and the purported subcontractor is sufficient to justify recovery by the latter's material suppliers under the Miller Act. See, e.g., United States ex rel. Gulfport Piping Co. v. Monaco & Son, Inc., 222 F.Supp. 175 (D.Md.1963), rev'd on other grounds, 336 F.2d 636 (4th Cir. 1964).
 Lane Construction Corp., supra, 477 F.Supp. at 411.
 
 
 [3]
 The amount of the DGI purchase order approximated 2.5% of the value of the prime contract. Middle parties contributing 2% have been held to be both subcontractors and materialmen. See, respectively, Lane Construction Corp., supra; Aetna Casualty & Surety Co., supra. See also Ellis Construction Co., supra (9% contributor deemed materialman); Monaco & Son, Inc., supra (40% contributor deemed subcontractor); Miller Equipment Co., supra (15% contributor deemed subcontractor)
 In the action sub judice 39 subcontracts were issued by Joint Venture. If each party thereto is a bona fide Miller Act "subcontractor", then the average contribution of each would approximate only 2.5% of the prime contract if no purchase orders had been issued, and would be less than 2.5% since purchase orders were issued. That the quantum of work supplied by DGI is proportionally slight clearly does not preclude classification of the relationship as "substantial".
 
 
 [4]
 A DGI representative testified:
 Q. For instance, there are several sizable contracts out there that don't have them?
 A. A large number. As a matter of fact, I'd say that 95 percent or more of our purchase orders don't have performance bonds in them. Some of those are American Bridge, which has a multimillion dollar purchase order, probably somewhere between $50 and $60 million. Paul Monroe has about a $5 million contract similar to DGI's that has no bond in it. Hollingsworth and Jackson, about.$3.2 million or so has no bond. Tempco, which supply the fintubes, $1.7 million, no bond. That's pretty much all of them. (emphasis added)
 A. No. What I said, you've got to remember that of this 1200 purchase orders that we have, the bulk of them are less than say $50,000, they're two to three hundred and three thousand and that sort of stuff, so it would be kind of senseless for us to put a bond on those.