205 N.J. Super. 56 (1985)
500 A.2d 32
WEST BANK OIL, INC., PLAINTIFF-APPELLANT,
v.
HARTFORD ACCIDENT & INDEMNITY COMPANY, DEFENDANT-THIRD PARTY PLAINTIFF-RESPONDENT,
v.
ROBERT R. PERNA AND MARJORIE PERNA, THIRD-PARTY DEFENDANTS.
A-5190-83T2.
Superior Court of New Jersey, Appellate Division.
Submitted September 25, 1985.
Decided October 22, 1985.
*57 Before Judges KING, SIMPSON and SCALERA.
Backes, Waldron & Hill, attorneys for appellant (Brenda F. Engel, of counsel and on the brief).
*58 Williams, Caliri, Miller & Otley, attorneys for respondent (Daniel Kinburn and David Golub, of counsel and on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
This case involves $418,665 in claims under a performance bond issued on public paving contracts. The claimant, West Bank Oil, Inc. was a supplier of liquid asphalt to Cumberland Asphalt Company (Cumberland) which in turn sold its finished product to the paving contractor, Perna Excavating. West Bank's claim that it sold liquid asphalt to a contractor or subcontractor covered under the New Jersey Public Works' Bond Act, N.J.S.A. 2A:44-143, did not survive a motion for summary judgment. Judge Levy decided that West Bank supplied an ordinary materialman, not a contractor or subcontractor, and thus was not protected by the Bond Act. We agree that West Bank's customer was a material supplier and affirm the judgment in the bonding company's favor.
These are the undisputed facts. West Bank is a corporation whose principal business is selling asphalt. One of West Bank's customers was Cumberland Asphalt Company, a company founded by Bruce Eastmunt with a substantial amount of technical advice from West Bank employees. Cumberland made "hot mix" paving material, buying raw materials such as gravel, sand mix and asphalt from suppliers and then selling the finished "hot mix" to contractors doing paving work.
While Eastmunt ran Cumberland, West Bank supplied asphalt on a cash-on-delivery basis. In early 1981, Robert Perna, the principal of Perna Excavating, bought out Eastmunt. Perna had been buying his asphalt from Cumberland but had been unable to buy sufficient quantities because Cumberland's output was limited by its lack of a line of credit with West Bank. Cumberland received all of its asphalt from West Bank. Perna Excavating agreed to take "full responsibility" for Cumberland's *59 debts and West Bank agreed to extend credit to Cumberland. West Bank received a corporate guaranty from Perna Excavating, but Perna refused to give West Bank his personal guarantee on Cumberland's behalf.
Cumberland then changed its name to A & P Asphalt when Vincent Archetto joined Perna as a partner. West Bank asserts that Archetto bought into the company by buying out Eastmunt's shares in early 1981; this conflicts with the deposition statements of West Bank employees maintaining that Perna bought Eastmunt's interests and Archetto came along later. The relationship between West Bank and Cumberland, renamed A & P Asphalt[1], however, remained intact. Perna wrote to West Bank and informed it that Perna Excavating was responsible for Cumberland's debts. Perna was quite involved in Cumberland's operations and Cumberland's checks to West Bank were signed by him.
Perna Excavating was obligated to give the public entities it worked for detailed "producer's analysis of materials and job mix formula" information sheets on which Cumberland had to list the ingredients of the hot mix asphalt it supplied. Perna signed these sheets as Cumberland's president; he also signed them as a representative of Perna Excavating, the actual paving contractor.
Dante Finnochi, West Bank's vice-president, said that Perna would request "mix designs" from West Bank when bidding a State or municipal paving contract. A mix design gives a breakdown of the materials found in a paving "mix" and was required by the entity requesting bids as part of a contractor's total bid. Finnochi said that West Bank salesmen would complete the mix designs and give them to Perna to submit with his bid. He said that a contractor engaged in paving work in this State is required to use one of five grades of mix, I-2 through *60 I-6, on a given stratum of a road. He also said that Cumberland occasionally, though rarely, had one of its own employees on a Perna Excavating jobsite. He noted that Cumberland never delivered its mix to jobsites because it did not own trucks.
Perna Excavating was awarded five paving contracts in Southern New Jersey, which it completed between May 1982 and January 1983. West Bank supplied Cumberland with the "AC-20" asphalt ingredient necessary for the "hot mix" sold to Perna for the five jobs; Cumberland amassed a debt with West Bank of $418,665.66 which remains unpaid. For each of the five projects, defendant Hartford Accident and Indemnity Company (Hartford) issued the bonds required by N.J.S.A. 2A:44-143 guaranteeing Perna Excavating's payment of all its "subcontractors, materialsmen, laborers, persons, firms or corporations" for work done and materials supplied.
After the completion of each contract, West Bank wrote to Hartford, advising it of the sums owed by Cumberland, "a subcontractor of Perna under the contract." Hartford denied liability to West Bank under the bonds.
The New Jersey Bond Act, N.J.S.A. 2A:44-143, says in pertinent part
When public buildings or other public works or improvements are about to be constructed, erected, altered or repaired under contract, at the expense of the state or any county, municipality or school district thereof, the board, officer, or agent contracting on behalf of the state, county, municipality or school district, shall require the usual bond, as provided for by law, with good and sufficient sureties, with an additional obligation for the payment by the contractor, and by all subcontractors, for all labor performed or materials, provisions, provender or other supplies, teams, fuels, oils, implements or machinery used or consumed in, upon, for or about the construction, erection, alteration or repair of such buildings, works or improvements.
N.J.S.A. 2A:44-145 says that someone owed money for labor, material or provisions may bring an action against the surety "80 days after the acceptance" by the public entity of the work performed.
The scope of N.J.S.A. 2A:44-143's coverage was discussed in Morris Co. Industrial Park v. Thomas Nichol Co., 35 N.J. 522 *61 (1961). The Court addressed the contention that the Bond Act covered "any claimant who furnishes materials or labor actually used in the completion of the public work, even where such materials are supplied to another materialman and to one far removed from privity of contract with the general contractor or a subcontractor." Morris Co., supra, at 528. The Court rejected this contention, saying
All this language in the lien law evidences to us without question that the Legislature has limited a right of lien to a materialman supplying either the general contractor or a subcontractor. The words are clear and express and our attention has not been called to any decision anywhere to support plaintiff's broader view.
To turn to the bond act, somewhat different language is used, but we feel constrained to say that it has to be similarly limited. Section 143, previously quoted in full (N.J.S. 2A:44-143), in defining the additional obligation required to be contained in the performance bond, specifies that it shall be "for the payment by the contractor, and by all subcontractors, for all * * * materials * * * used or consumed in, upon, for or about the construction * * *." [Id. at 529].
The Court noted that the "bond required of the general contractor can in no sense be considered insurance by which the entire building industry shares the risk equally." Id. at 533.
The Morris Co. plaintiff argued that even if the Bond Act did not cover suppliers of all products used in the project, as opposed to suppliers of contractors or subcontractors, the materialman who owed it money was actually a subcontractor. The plaintiff had supplied dirt from its pit to Kitchell, Inc., which in turn supplied the dirt to Nichol Co., a general contractor doing work on the New Jersey Turnpike. The trial judge had concluded that Kitchell was a materialman and not a subcontractor and the Supreme Court agreed. Id. at 534-536.
The Court cited the definition of subcontractor found at N.J.S.A. 2A:44-126, the Municipal Mechanics Lien Law, and concluded that it should apply to "subcontractor" in the Bond Act. Id. at 533.
"Subcontractor" means a person having a contract under a contractor for the performance of the same work, or any specified part thereof, and also a person *62 having such a contract with a subcontractor, for the performance of the same work or any specified part thereof. [N.J.S.A. 2A:44-126].
The Court noted that the
"emphasis is, of course, on the subcontractor being engaged to do all or some part of the work, i.e., the construction itself, involving at least some labor in the installation of materials and not merely the supplying of materials." [Id. at 534].
The Court applied its definition of subcontractor to Kitchell and concluded that it was a materialman. Kitchell supplied fill dirt and delivered it "at the spot along the highway construction where Nichol wished and ordered it dumped." The Court found it important that Kitchell did not process the dirt before or after it was delivered and that it did no further moving or grading after dumping the dirt from trucks. The Court noted, however, that it was
not here concerned with the possibility of classifying as a subcontractor a supplier who does some processing or fabrication of the materials off the work site prior to delivery. See Theisen v. County of Los Angeles, 54 Cal.2d 170, 5 Cal. Rptr. 161, 352 P.2d 529 (Sup.Ct. 1960). [Id. at 535].
In the case before us, Cumberland did not actively participate in Perna's paving operations. It was not "engaged to do all or some part of the work ... involving at least some labor in the installation of materials and not merely the supplying of materials." The material supplied was not a unique, custom mix but a standard type of mix. Aside from deposition testimony showing that a Cumberland employee may have been present at Perna jobsites, there were no allegations that Cumberland was involved in any actual paving work or other work at the site. Under the Morris Co. standard, Cumberland was a material supplier, not a contractor or subcontractor.
In contrast is Theisen v. County of Los Angeles, 54 Cal.2d 170, 5 Cal. Rptr. 161, 352 P.2d 529 (Sup.Ct. 1960), relied upon by our Supreme Court in Morris Co., 35 N.J. at 535, where the California Court considered whether a company that supplied a general contractor with custom doors complying with architectural specifications was a materialman or a subcontractor. The California court noted that

*63 the essential feature which constitutes one a subcontractor rather than a materialman is that in the course of performance of the prime contract he constructs a definite, substantial part of the work of improvement in accord with the plans and specifications of such contract, not that he enters upon the job site and does the construction there. We are not here concerned with the mere furnishing of materials from which doors were to be constructed by the general contractor nor are we interested in the sale of standard stock-in-trade doors. Specifically we are dealing with a contract whereby the doors were to be fabricated according to the specifications of the prime contract and as a constituent part of the construction of the public improvement which was the subject of the contract. [54 Cal.2d 170, 5 Cal. Rptr. 161, 352 P.2d at 537-538].
The California court held the door-seller to be a subcontractor  a "supplier who does some processing or fabrication of the materials off the work site prior to delivery." Morris Co., 35 N.J. at 535.
West Bank relies on F.D. Rich Co. v. Industrial Lumber Co., 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974). At issue in F.D. Rich was whether a company that supplied a general contractor with "all exterior plywood" needed in a federal government project was a materialman or a subcontractor. The plywood supplier had also agreed to "select, modify, detail and install all custom millwork" for the project. The United States Supreme Court defined "subcontractor," citing to its earlier opinion in MacEvoy Co. v. United States ex. rel. Tomkins Co., 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944),
... a subcontractor is "one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract...."
[417 U.S. at 123, 94 S.Ct. at 2162].
The Court, again citing the MacEvoy decision, explained why materialmen and subcontractors were treated differently under the Miller Act, 40 U.S.C.A. §§ 270a et seq., the Federal equivalent of New Jersey's Bond Act involved in the case now before us.
"The relatively few subcontractors who perform part of the original contract represent in a sense the prime contractor and are well known to him. It is easy for the prime contractor to secure himself against loss by requiring the subcontractors to give security by bond, or otherwise, for the payment of those who contract directly with the subcontractors.... But this method of protection is generally inadequate to cope with remote and undeterminable *64 liabilities incurred by an ordinary materialman, who may be a manufacturer, a wholesaler or a retailer." Id. at 110, 64 S.Ct. at 895. [Ibid.; emphasis in original].
The Court concluded that the plywood supplier was a subcontractor under the Miller Act; crucial to this holding was the supplier's substantial involvement with the general contractor and the fact that it deemed the Miller Act "highly remedial", to be liberally construed. 417 U.S. at 124, 94 S.Ct. at 2162-63.
Our Supreme Court has adopted a somewhat different philosophy regarding the New Jersey Bond Act. In Morris Co., it noted that the two statutes in question, the lien law and the Bond Act, "being of statutory origin and in derogation of the common law, should be strictly construed with respect to the provisions giving rise to the lien, but liberally construed as to provisions for enforcement." 35 N.J. at 526. Thus, while the Federal courts may adopt an expansive definition of the term subcontractor, our Supreme Court has expressed that it is more appropriate to more narrowly define the group whose debts can be enforced by allowing liens or claims against the contractor's bond.
West Bank cites several other federal cases where material suppliers were held to be subcontractors. See, e.g., United States v. Morrison-Knudsen Co., Inc., 687 F.2d 129 (6th Cir.1982) (supplier providing 40% of piping for a project, "required to submit thousands of shop drawings ... for approval to assure that the pipe conformed to the specifications of the prime contract," held a subcontractor because of "high degree of responsibility ... to assume an identifiable portion of the prime contract"); United States v. MSI Corp., 350 F.2d 285 (2nd Cir.1965) (builder-supplier of custom mechanism for rapidly opening roofs of missile silos held a subcontractor). These cases are factually quite different from the case before us; while Cumberland sold a standard asphalt mix to Perna Excavating, the suppliers in these federal cases either provided a unique product or actively participated in performing the work under the contract. Cumberland's participation in Perna Excavating's *65 work was limited to providing a rather fungible material or product, a specific grade of mixed asphalt.
West Bank also argues that because Cumberland and Perna Excavating were interrelated operations, Cumberland should be considered "part of" the contractor. However, West Bank at all times knew that Cumberland and Perna Excavating were separate legal entities. If West Bank had thought that the two entities were essentially the same, it might not have asked Perna Excavating to provide its corporate guarantee of Cumberland's obligations. The public contracts were all between Perna Excavating and the public entities. The bond's coverage will not now be extended after the fact to cover an allegedly "related company's" debts. Judge Levy correctly ruled that Cumberland was a material supplier and not Perna Excavating's subcontractor. Cumberland did nothing more than supply Perna Excavating with a specific grade of a standard product which Perna Excavating readily could have obtained elsewhere. West Bank did not supply either a contractor or a subcontractor but rather sold to a material supplier. The summary judgment in Hartford's favor is affirmed.
NOTES
[1] For sake of simplicity we will continue to refer to A & P Asphalt as Cumberland in the balance of this opinion.