

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-27-2007

# E&H Steel Corp v. C Pyramid Entr Inc

Precedential or Non-Precedential: Precedential

Docket No. 06-4209

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

## Recommended Citation

"E&H Steel Corp v. C Pyramid Entr Inc" (2007). *2007 Decisions*. Paper 152.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/152

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 06-4209

———————————

UNITED STATES OF AMERICA  FOR THE USE
AND BENEFIT OF E & H STEEL CORPORATION

vs.

C. PYRAMID ENTERPRISES, INC.;
FIDELITY & DEPOSIT COMPANY OF MARYLAND;
and ZURICH AMERICAN INSURANCE COMPANY,

E & H Steel Corporation, Appellant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. No. 04-cv-02519)
District Judge:  Honorable Robert B. Kugler

———————————

Argued September 18, 2007
Before:  SLOVITER, SMITH and WEIS, Circuit Judges.
Filed: November 27, 2007

———————————

David W. Mockbee, Esquire (ARGUED)
Mary Elizabeth Hall, Esquire
MOCKBEE HALL & DRAKE, P.A.
Lamar Life Building, Suite 1000
317 E. Capitol Street
Jackson, Mississippi   39201

Sandhya M. Feltes, Esquire
Kaplin, Stewart, Meloff, Reiter & Stein
910 Harvest Drive
P.O. Box 3037
Blue Bell,  PA  19422

Attorneys for Appellant

Paul W. Norris, Esquire (ARGUED)
Lewis J. Pepperman, Esquire
STARK & STARK
A Professional Corporation
P.O. Box 5315
Princeton,  New Jersey  08543

Attorneys for Appellees

_____

OPINION

_____

WEIS, Circuit Judge.

2

In this Miller Act case, we decide that a firm acted as a subcontractor when it supplied fabricated steel to the prime contractor that then used the material to construct the framework for a large Air Force facility. The subcontractor defaulted in payments due the company that it hired to fabricate the steel and deliver it to the construction site. The District Court denied recovery to the steel fabricator in this suit against the prime contractor and its sureties. We will reverse and remand for entry of judgment in favor of the steel company.

In September 2002, C. Pyramid Enterprises, Inc. was awarded a contract by the United States Army Corps of Engineers to design and build a large C-17 Maintenance Hangar and Shops facility at the McGuire Air Force Base in New Jersey. The original contract price was $24,119,450.00.

Pyramid issued a standard form "purchase order" to Havens Design-Build to provide custom fabricated structural steel for the building's framework at a cost of $2,230,000.00. The agreement provided that Havens was also to arrange for the preparation of shop drawings and erection drawings, design the connectors for the steel, and perform some "design assist engineering" that primarily involved material substitution.

Havens in turn contracted with E & H Steel Company to fabricate the steel and deliver it to the construction site. E & H delivered 50 trailers of fabricated steel between November 13, 2003 and April 16, 2004.[1] Pyramid erected the steel framework

---

[1] E & H asserts that the shipments contained 5,379 major pieces of structural steel, which included seven long-span jumbo

for the building and did most of the remaining construction itself, including the electrical, mechanical, site utilities, plumbing, and concrete work.

In accordance with the Miller Act, 40 U.S.C. § 3131(b)(2), Pyramid issued a payment bond in favor of "all persons having a direct relationship with [Pyramid] or a subcontractor of [Pyramid] for furnishing labor, material or both in the prosecution of the work provided for in the contract." Defendants Fidelity & Deposit Company of Maryland and Zurich American Insurance Company acted as sureties on the bond.

Although it had been paid by Pyramid during the construction process, Havens filed for bankruptcy owing E & H $565,125.40 for the delivered steel. E & H brought suit against Pyramid and its sureties, asserting entitlement to reimbursement from the payment bond. After a bench trial, the District Court found in favor of defendants.

The Court correctly determined that because of a statutory limitation E & H's right to recover on the bond hinged on whether Havens was a "subcontractor" under § 3133(b)(2) of the Miller Act. However, case law did not provide a uniform rule for determining whether a company such as Havens, which acted as a middleman between a general contractor and a supplier of materials or services, was a "subcontractor." In

---

roof trusses 203 feet in length and five steel members that weighed between 19,000 and 20,000 pounds. Pyramid does not dispute this assertion.

4

resolving that issue, the Court considered a number of factors, including the nature of the material or service supplied, the cost of the material or service in relation to the total contract price, the payment terms and exchange of information, and the overall relationship between the contractor and the middleman.

The District Court concluded that Havens furnished standard work customarily performed by steel fabricators, a role similar to that of a supplier of pre-cut wooden beams for residential construction. Havens supplied material from non-inventory stock and Pyramid used the steel to erect the building's substantial frame. Although Havens' work on the project comprised 7.8% of the total contract price, the District Court noted that Havens did not post a bond or provide insurance or payroll data to Pyramid. Finally, the District Court observed that Pyramid and Havens did not have a prior relationship.

After evaluating these details, the District Court held that Havens was a material supplier and not a "subcontractor" under the Miller Act. Therefore, E & H was not entitled to recover on the bond.

E & H timely appealed. We have jurisdiction under 28 U.S.C. § 1291 and under the Miller Act, 40 U.S.C. § 3133(b)(3)(B).

I.

Congress recognized that sovereign immunity left suppliers of labor or materials for federal construction projects

without the protection of the mechanics' liens normally available in private industry.  See Dep't of Army v. Blue Fox, Inc., 525 U.S. 255, 264-65 (1999).  To provide some protection for suppliers, Congress enacted the Heard Act[2] and later replaced it with the Miller Act, found in its current version at 40 U.S.C. § 3131, et seq.  Id.[3]

The Miller Act requires every contractor on a federal government contract exceeding $100,000 to provide "[a] payment bond with a surety . . . for the protection of all persons supplying labor and material in carrying out the work provided for in the contract."  40 U.S.C. § 3131(b)(2).  In pertinent part, § 3133(b)(1) provides that "[e]very person that has furnished labor or material . . . and that has not been paid in full within 90 days after the day on which the person did or performed the last

---

[2]  Act of August 13, 1894, ch. 280, 28 Stat. 278, as amended by Act of February 24, 1905, ch. 778, 33 Stat. 811.

[3]  See also United States ex rel. Daniel H. Hill v. American Sur. Co.,  200 U.S. 197, 202 (1906) (The Heard Act as amended "shows the consistent purpose of Congress to protect those who furnish labor or material in the prosecution of public work."); Fanderlik-Locke Co. v. United States ex rel. Morgan, 285 F.2d 939, 942 (10th Cir. 1960) ("The purpose of the Miller Act is to provide security for those who furnish labor and material in the performance of government contracts . . . . The benefits of the Act are not intended for the prime contractor who is required by the Act to furnish a bond to effectuate its provisions." (internal citations omitted)).

6

of the labor or furnished or supplied the material . . . may bring a civil action on the payment bond."  40 U.S.C. § 3133(b)(1).

However, § 3133(b)(2) limits the scope of those protected.  It states:

> "A person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond may bring a civil action on the payment bond on giving written notice to the contractor within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made."

40 U.S.C. § 3133(b)(2).

Because the statute does not define the term "subcontractor," the Supreme Court has been called upon to explain the meaning of the term.  In Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tompkins Co., 322 U.S. 102 (1944), the Court recognized that the Miller Act "is highly remedial in nature.  It is entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects."  Id. at 107.

Nevertheless, the Court observed that it must also give effect to Congress' intent to limit liability under the Act through

7

the restrictions in § 3133(b)(2).  Id. at 107-08.  In the Court's view, Congress used the term "subcontractor" in the technical sense to apply to "one who performs for and takes from the prime contractor a specific part of the labor or materials requirements of the original contract, thus excluding ordinary laborers and materialmen."  Id. at 109.[4]

The Court pointed out that its conclusion was supported by practical considerations in that it was unlikely that Congress intended to impose liability on the general contractor for labor and materials provided by those beyond the "relatively few subcontractors who perform part of the original contract" and are well known to the prime contractor.  Id. at 110.  In a later case, the Court also made clear that Congress "intended the scope of protection of a payment bond to extend no further than

---

[4]  Thus, although a kingdom may be lost for lack of a nail, a vendor who supplied a box of nails is unlikely to be protected by the Miller Act.

> "For want of a nail the shoe was lost.  For want of
> a shoe the horse was lost.  For want of a horse the
> rider was lost.  For want of a rider the battle was
> lost.  For want of a battle the kingdom was lost.
> And all for the want of a horseshoe nail."

A version of this rhyme of apparent English origin first appeared in written form in John Gower's *Confessio Amantis*, dated approximately 1390.  Benjamin Franklin included a version in his *Poor Richard's Almanack*.

to sub-subcontractors." J.W. Bateson Co. v. United States ex rel. Bd. of Trustees, 434 U.S. 586, 591 (1978).

The Supreme Court further explained its definition of a "subcontractor" under the Miller Act in F. D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116 (1974). F. D. Rich, the prime contractor for a federal housing project, awarded two contracts to Cerpac Company, one for the installation of custom mill work and another to provide standard sheets of plywood. Id. at 119. Cerpac had a close relationship with F. D. Rich and had worked with it on other projects. Id. at 118. Cerpac placed an order for the plywood with Industrial Lumber, a broker, which purchased the plywood from its own suppliers. Id. at 119. After Cerpac fell behind in its payments for the wood, Industrial Lumber filed a claim under the Miller Act. Id. at 120.

The Court concluded that under MacEvoy the test for determining whether one is a subcontractor hinges on "the substantiality and importance of his relationship with the prime contractor." Id. at 123. The Court noted that Cerpac, in addition to its role as a plywood supplier, had a contract "to select, modify, detail and install all custom millwork . . . [and] in effect, took over a substantial part of the prime contract itself." Id. at 124. Finding that the close relationship and prior dealings between Cerpac and F. D. Rich was determinative, the Court concluded that Cerpac acted as a "subcontractor" when it supplied the plywood and Industrial was entitled to recover. Id.

The F. D. Rich Court explained that the ability of a prime contractor to protect itself by requiring a middleman to post a

9

bond is an indication that he is a "subcontractor." Id. Generally, when a subcontractor is required to provide a bond the premiums will cause him to increase his bid. See Note, Mechanics' Liens and Surety Bonds in the Building Trades, 68 Yale L.J. 138, 171 (1958) ("[W]here bonding is conventional, premiums constitute a construction expense which is reflected in every contractor's bid. The owner who accepts a bid may be expected to pass the premium costs on to the ultimate users of the particular project."). Thus, a prime contractor may decide to forego requiring a bond from a subcontractor to obtain a lower bid. The Court's statement appears to recognize that it is equitable for a prime contractor to bear the risk of loss when he does not require the subcontractor to secure a bond or make other arrangements for the security of its suppliers.

To summarize, MacEvoy and F. D. Rich established broad criteria under which "subcontractor" status applies to one who performs a specific part of the original contract and has a substantial and important relationship with the prime contractor.

Because of the variety of circumstances that arise in government construction projects, the general standards of MacEvoy and F. D. Rich are not always easy to apply. In the many cases that have applied MacEvoy and F. D. Rich, lower courts have created inconsistent tests for defining "subcontractor" status and have compiled laundry lists of elements to consider. The District Court here cited opinions of various appellate courts in describing circumstances it considered relevant:

10

"Some of the factors to consider include: (1) the nature of the material or service supplied by the alleged subcontractor to the prime contractor, see F. D. Rich, 417 U.S. 116 (1974); United States ex rel. Consol. Pipe & Supply Co. v. Morrison-Knudsen Co., 687 F.2d 129 (6th Cir. 1982); Miller Equip. Co. v. Colonial Steel & Iron Co., 383 F.2d 669 (4th Cir. 1967); United States ex rel. Wellman Eng'g Co. v. MSI Corp., 350 F.2d 285 (2d Cir. 1965); (2) the financial magnitude of the goods or services provided in relation to the total federal contract, see Morrison-Knudsen, 687 F.2d 129; Miller, 383 F.2d 669; (3) the payment terms and exchange of information between the prime contractor and alleged subcontractor, see MSI Corp., 350 F.2d 285; and (4) the overall relationship between the prime contractor and the alleged subcontractor, see F. D. Rich, 417 U.S. 116; Morrison-Knudsen, 687 F.2d 129."

United States ex rel. E & H Steel Corp. v. C. Pyramid Enterprises, Inc., 2006 WL 2570849, *6 (D.N.J. Sept. 1, 2006) (some internal citations omitted).

The District Court also noted that, as part of these inquiries, courts have also considered

"(1) whether the goods produced came from inventory or whether they had to be custom-manufactured, (2) whether they were

11

complex in nature, (3) whether they constituted a significant and integral portion of the overall project, (4) whether the items provided were generally available on the market, (5) whether the subcontractor performed work on-site, (6) whether the alleged subcontractor had design or installation responsibility for the items or services it provided, and (7) whether the alleged subcontractor had ultimate responsibility for a portion of the work under the government contract."

Id. (citations omitted).

Although a survey of factors can be helpful in applying the standards in MacEvoy and F. D. Rich, the opinions interpreting those two cases often evolve into a process of "color matching" the various precedents rather than focusing on the purpose of the Act, the relationship between the parties, and the middleman's role in the project.  See, e.g., United States ex rel. Conveyor Rental & Sales Co. v. Aetna Cas. & Sur. Co., 981 F.2d 448, 452-55 (9th Cir. 1992).

Many of the opinions emphasize the nature of the materials supplied while overlooking the fact that the Supreme Court held that a firm that provided plywood sheets that were not unique or customized was a "subcontractor" in F. D. Rich. See F. D. Rich, 417 U.S. at 119.  The Miller Act does not make distinctions based on characteristics such as whether the material supplied was customized or unique.  Thus, for example, the oft-cited pre-F. D. Rich case of Aetna Cas. & Sur. Co. v.

12

United States ex rel. Gibson Steel Co., 382 F.2d 615 (5th Cir. 1967), inappropriately emphasized the simplicity of the prefabricated steel supplied to the contractor. Id. at 618 (concluding that "[t]he most important factor is the nature of the items . . . supplied" and that "the variety and relative simplicity of the items supplied weigh heavily against finding" that the supplier was a subcontractor).

Similarly, in another pre-F. D. Rich case, United States ex rel. Bryant v. Lembke Constr. Co., 370 F.2d 293 (10th Cir. 1966), the Court was impressed by the simplicity of materials supplied when denying subcontractor status to a company that supplied concrete to the prime contractor. Id. at 295-96.

Although furnishing customized or complex material may in some cases be a helpful indication of the strength of the supplier's relationship with the prime contractor, it does not follow that the absence of such characteristics in the material supplied establishes a lack of "subcontractor" status. The holding in F. D. Rich shows that a person who furnishes very basic materials can be a "subcontractor," thus allowing his suppliers to recover on the payment bond.

In Morrison-Knudsen, the Court of Appeals correctly focused more on the substantiality of the relationship between the prime contractor and alleged subcontractor when it was presented with circumstances somewhat similar to those before us. 687 F.2d at 135-36. The Court concluded that a fabricator that supplied large amounts of pipe, some of which required a special lining and coating, was a "subcontractor." Id. at 134. The Court observed that, although the fabricator did not install

13

the pipe or participate in the project design, it supplied 40% of the pipe for the facility, submitted shop drawings for approval of the prime contractor, and had representatives at the job site to help interpret the drawings and check the material for damage when it arrived. Id. at 135.

The Court of Appeals also stated that the prime contractor's ability to procure a bond from the middlemen was "a significant and probative consideration." Id. Considering all these circumstances, the Court concluded that the evidence established the substantial relationship necessary to designate the fabricator as a "subcontractor." Id. at 136.

The Morrison-Knudsen Court gave little consideration to the fact that the contractual instrument was "styled a 'purchase order.'" Id. at 134. We agree that the label that the parties apply to the relationship between the contractor and the middleman is not determinative of "subcontractor" status. The designation of the agreement as a "purchase order" rather than a "subcontract," therefore, or the failure to designate a supplier as a "subcontractor," is entitled to little weight.

Rather than attempting to reconcile the often inconsistent case law and laundry lists of factors, we prefer to focus our analysis on the formulas provided by the Supreme Court, vague as they are, by following their rationale.

We begin with the premise that the Miller Act is to be interpreted liberally to protect persons who supply labor or materials for government construction projects. That protection is restricted to parties who are no more distant from the prime

14

contractor than sub-subcontractors.  J.W. Bateson Co., 434 U.S. at 591.  "Subcontractor" status may extend to those who supply necessary material, as well as to those who incorporate items into the structure.

Neither the Miller Act nor the Supreme Court make a distinction between those who supply complex or simple material, nor do they differentiate between projects involving simple and complicated structures.  The Court's definition of a "subcontractor" is "one who performs for and takes from the prime contractor a specific part of the labor or materials required by the original contract."  MacEvoy, 322 U.S. at 109.  A "subcontractor" must have a substantial and important relationship with the prime contractor.  F. D. Rich, 417 U.S. at 123.  The prime contractor's ability to require the posting of a bond is also an indication of where the risk of financial loss should fall.  Id. at 123-24; MacEvoy, 322 U.S. at 110.

## II.

The issue here is whether Havens qualifies as a "subcontractor" under this approach.  We conclude that it does.

Havens' task was to supply a specific and crucial part of the materials required by the original contract to construct the steel framework.  It arranged for the fabrication and delivery to the site of a substantial amount of structural steel necessary for the skeleton of the hangar building.  Havens also prepared shop drawings and erection drawings, designed the connectors, and performed some "design-assist engineering."

15

The relationship with the prime contractor was a substantial and important one. The work and material Havens supplied for the framework required Pyramid to exercise substantial attention and oversight. The shop drawings were submitted to Pyramid for approval and the parties communicated about the connectors design and design-assist work.

Although Pyramid did most of the construction work itself, the steel that Havens supplied had to be carefully manufactured so that Pyramid could efficiently erect the framework. Delivery of the steel to the site had to be arranged to comply with Pyramid's construction schedule. The importance of this coordination became clear when, in Havens' bankruptcy proceeding, Pyramid made a claim against Havens for costs incurred because of delays in delivery of the steel.

Further, it does not appear that, for this project, a large number of subcontracts were awarded and none were as large as that with Havens. Finally, Pyramid likely could have requested a bond, although the record does not disclose whether Havens could have qualified for one.

The District Court, in denying recovery, analogized the supplying of pre-fabricated steel beams to providing pre-cut wood beams for residential construction. As noted above, in F. D. Rich the Supreme Court decided that a firm that furnished standard sheets of plywood was a "subcontractor." A supplier of pre-cut wooden beams could qualify as well. Moreover, the fact that Havens' contract amounted to 7.8% of the total project costs is not a weighty reason to deny recovery, especially since Pyramid did most of the construction itself.

16

We conclude, therefore, that Havens was a "subcontractor." Because it had a contract with Havens, E & H is entitled to recover under the Miller Act bond. Accordingly, the judgment of the District Court will be reversed and the case will be remanded for entry of a judgment in favor of E & H Steel Company.

17